**GAF CORPORATION, Plymouth Investments, Inc., GAF Chemicals Corporation, Jay & Company, Inc. and Mayfair Investments, Inc., Plaintiffs,**

v.

**UNION CARBIDE CORPORATION, Warren M. Anderson, John J. Creedon, Roberto De Jesus Toro, James L. Ferguson, Alec Flamm, Harry J. Gray, James M. Hester, Jack B. Jackson, Horace C. Jones, Ronald L. Kuehn, Jr., C. Peter McColough, William S. Sneath, Russell E. Train and Kathryn D. Wriston, Defendants.**

**No. 85 Civ. 9588 (MP).**

United States District Court,
S.D. New York.

Dec. 30, 1985.

Paul, Weiss, Rifkind, Wharton & Garrison, by Arthur L. Liman, Max Gitter, Andrew J. Peck, Philip Bentley, New York City, for plaintiffs.

Sullivan & Cromwell by John L. Warden, Gandolfo V. DiBlasi, William L. Farris, New York City, for defendants.

MILTON POLLACK, Senior District Judge.

This is a motion by the plaintiff under Rule 65, Federal Rules of Civil Procedure, for provisional relief in advance of a full-scale trial on the merits. Much is argued here by plaintiff which would be more appropriate for discussion following a full-scale submission of all the relevant facts and circumstances. Much of that sort of argument is just that—it is grounded largely on hypotheses, speculations, and elusive concepts.

### Preliminary

Analysis of the plaintiff's claims shows that it is arguing, in essence, that, in the judgment of the tender offeror, the Directors went further as a matter of degree than was necessary to protect the legitimate corporate interests to be conserved. There are two sides to that sort of opinion. A suggestion of overkill involves a matter of conflicting judgment.

Another cardinal misconception of the plaintiff, the tender offeror, is that the Board of Directors of Carbide owe the tender offeror duties, or at least the duty, to so fashion a competitive offer as to aid the success of the hostile tender. That notion was struck down many years ago in a contest for control. *See Piper v. Chris-Craft Industries, Inc.,* 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1976).

Peering through the haze created by the conflicting submissions is that portion of the last sentence of the plaintiff's brief reading—plaintiff seeks a direction "prohibiting the consummation of (1) Carbide's exchange offer (*or at least directing that provision be made for the notes to be callable by an acquiror*)." (emphasis added).

The tender offeror thus seeks to have Union Carbide ("Carbide" or "the Company") make liquid assets available to pay for

the control of the Company that the plaintiff seeks.

### In More Detail

The principal issue posed by this application for a Preliminary Injunction brought by a shareholder of the corporation boils down to whether a disinterested Board of Directors of a New York business corporation, without a Charter amendment, as part of an exchange offer—presenting shareholders with an alternative offer to another Company's attempt to buy control—may lawfully authorize the creation and issuance of high-interest corporate debentures and notes containing covenants to protect their credit value which restrict for various periods of time the sale, in any year, of more than 25% of the Company's net assets and, in certain circumstances, not more than 5% thereof.

Such debentures and notes have been authorized by the Board of Directors of Union Carbide and are being offered by the Company, together with $20 in cash, in exchange for 23,550,000 (35%) and up to 47,100,000 (70%) shares of the Company's outstanding voting common stock. That offer is a competitive alternative to an offer by GAF of $68 in cash for 48,000,000 of the Company's shares, providing GAF gets the minimum number of shares they seek and raises the funds to pay for them. GAF presently owns approximately 10% of the Company's stock and seeks to acquire control of the corporation.

The Board of Directors of Carbide has stamped the opposing all cash offer and the accompanying plan of liquidation of large segments of the assets to finance the offer as grossly inadequate and unfair and not in the best interests of the Company and its shareholders. The Company's offer is not conditioned upon any minimum number of shares being tendered to the Company. The GAF offer is conditioned, among other things, upon (i) a minimum of 31,000,000 shares (46% of the capital stock) being validly tendered, and (ii) the bidder having obtained sufficient financing to pay for the stock tendered to GAF together with all

related fees and expenses and to satisfy certain other obligations and financial requirements.

Restrictive covenants in the debentures and notes offered by the Company for its outstanding stock could deter consummation of the GAF offer if the Company's offer were to be accepted in substantial part and also could deter other persons from purchasing the Company's shares in an attempt to acquire control of the Company, especially persons who would hope to finance such acquisitions by utilizing the Company's own assets or borrowing capacity.

The four [1] corporate actions complained of herein, believed to violate shareholder rights and improperly to impair the plaintiff's tender offer, are all matters cognizable under the Business Judgment Rule for corporate management and do not require charter amendments approved by the shareholders; each is within the wide latitude of management authority conferred on a Board of Directors by New York law and may be considered under the Business Judgment Rule. The defendants, in adopting those actions, did not assume powers and make decisions that rightfully may be exercised only by a shareholder body. The Business Judgment Rule keeps courts from becoming enmeshed in complex corporate decision-making, a task courts are ill-equipped to handle.

A dispassionate review of the sequence of events and the perceived interests to be safeguarded, and the manner in which the informed judgment of the Board of Directors was exercised failed to establish a *prima facie* showing that the Directors acted in bad faith. The standard of review that the Court has adopted and has applied herein is the strictest standard of inquiry. The Court allocated to the Directors the burden to prove that the transactions complained of were reasonable and fair as well as made in the exercise of independent judgment. Fundamentally, resolution of this issue posed questions of fact, rather than of law and involved a resolution of issues of credibility of the oral testimony.

The Court finds, on evaluating the evidence and the credibility of the witnesses, under all of the facts and circumstances in evidence and after placing the burden on the Directors of going forward on the issues, that the actions of the Directors complained of were reasonable and fair, not motivated by self-interest, nor did they go beyond that permissibly and reasonably viewed as necessary. The transactions complained of were grounded on sound reason, made with a good-faith intent to serve the shareholders' best interests and, in the case of the debt securities under the Exchange Offer, to provide conscionable security for and protection of their credit value. Independent outsiders, comprising a majority of the Board, legally and factually disinterested in the benefits of their decisions approved the actions taken. The Board did not act, as charged by plaintiff, to keep control of the Company entrenched within the present Board of Directors regardless of Carbide's real best interests. The Carbide offer was not intended to and does not discriminate against bidders for control. It was an alternative available for the stockholders' consideration. It is a measured and responsible action taken with a purpose to protect the best interests of Carbide and its shareholders, and those who acquired the debt securities to be issued.

What the plaintiff plainly fails, or wishes not, to recognize is that shareholders might well decline its cash buyout offer and prefer instead either to remain with the Company as stockholders or to accept the position formulated by the Directors. In addition, even accepting the Company's self-tender offer, they might wish to assure fair and equitable recognition and treatment

---

1. The severance compensation agreements, termed "golden parachutes" by GAF, adopted on October 22, 1985, were not the subject of injunctive relief sought either in the amended complaint or the motion which brought on the hearing for a preliminary injunction and need not be dealt with herein, except in passing.

for its relationships with pensioners, employees and management.

The Directors are not to be faulted for their caution in not leaving to chance the resolution of questions settled by the actions complained of. The protection of loyal employees, including managers, of the organization is not anathema in the Courthouse. To be compared are the situations in which similar protection to the well-being and security of employees, pensioners, and loyal members of management is regularly accorded when a business is moved or substantially liquidated; they are similarly directly affected by unfriendly raids on control.

Much of the plaintiff's argument relies on the notion that the actions of the Directors were too broad. But one may ask the question, in whose judgment? Certainly such an arguable position does not deserve preliminary injunctive relief to act as a herald for the tender offeror's side of the contest.

The expert testimony offered by plaintiff to dispute the restrictions set out in the debt instruments contained in the Company's offer disintegrated upon a showing that the challenged restrictions were of the kind basically used by that expert's own securities firm (of which he claimed unawareness), and the terms thereof essentially followed a pattern developed by the takeover Bar, depending upon which side of the fence it was called to serve.

When asked if the restrictive provisions of the debt securities in Carbide's offer challenged by the plaintiff were substantially similar to others tested in the marketplace by his own banking firm, the plaintiff's expert acknowledged that they were. When asked whether the language in the two looked like they came from the same form book, the witness answered, in part, that "[i]t does appear the language is generally similar."

The Carbide Board owed no duty to GAF as a tender offeror to facilitate an unfair takeover bid by making the Company's assets available to finance it. Its duty is solely to the welfare of Carbide's investors and to deal with the interests of Carbide's employees and management fairly, in furtherance of those interests of investors.

The Board of Directors of Carbide owed no duty to assist GAF to finance its quest for control of Carbide by use of financing, directly or indirectly, to be derived from the dismemberment and liquidation of divisions representing 40% of Carbide's assets.

The Chairman of GAF testified concerning the restrictive covenants:

Q. So the covenants that we heard about in the course of the last day, restrict asset sales, don't prevent you from making your offer, is that correct?

A. It does not legally prevent us, if we wanted to continue with a very highly leveraged company.

He admitted that GAF's offer compels liquidation of vast segments of Carbide's assets:

Q. So as a commercial matter, you cannot proceed with your offer unless you liquidate substantial assets after taking control, is that correct?

A. We think it's necessary to do so, yes.

The GAF Chairman further testified to the scope of that liquidation. He said, "we plan asset sales of approximately 4 billion dollars in terms of this asset disposition program."

The action of the Board to foster the future intact existence of Carbide, except for such sales of assets as would reasonably be needed to prune aspects of the Company and leave it substantially alive as it presently is, represents a reasonable view on the part of the Board of what is best for shareholders.

The actions of the Board were within the bounds of the law, and the only question—one of fact involving credibility—is whether the actions taken were based on informed reasonable judgment of an admittedly independent Board with no personal interests at stake.

A corporation with a perceived threat of dismemberment of large divisions of the enterprise, employing thousands of employ-

ees, owes substantial regard for their pension benefits, and in the case of loyal management, severance benefits. These legitimate concerns for their past conduct of the enterprise and its requirements need not be left to the goodwill of an unfriendly acquirer of corporate control in the jungle warfare involving attempted takeovers. The exercise of independent, honest business judgment of an enlightened and disinterested Board is the traditional and appropriate way to deal fairly and even-handedly with both the protection of investors, on the one hand, and the legitimate concerns and interests of employees and management of a corporation who service the interests of investors, on the other. Where such a Board, which has been voted into office, exists, their judgment on corporate management, obligations and policy—and any actions appropriate in that regard—are and should be controlling. Such a result is necessary in order to maintain balance and serenity in the marketplace and in corporate affairs, and to make sure that the existing shareholders are not lost someplace in the shuffle.

Deterring an unfair offer is entirely legitimate. GAF is not entitled to have the terms of an exchange offer dictated by GAF, free of competition.

Self-appointed potential acquirers of control are not a protected species in corporate law. The hostile offeror is not entitled to have Boards of Directors smooth his path to control. That has to be earned with fairness and proof in the competition for the voting stock that satisfies the shareholders that they should sell and are being offered a fair price.

Carbide argues that the Company's Exchange Offer was designed to ensure that profits from its business operations would flow through to the shareholders of Carbide, rather than to the shareholders of GAF. Carbide claims that GAF's plans would, after paying off its acquisition indebtedness through a substantial liquidation, result in a virtual gift to GAF of Carbide's valuable industrial gas and chemicals and plastics businesses, because GAF would acquire them at no cost.

To satisfy the burden of proving the reasonableness and fairness of the judgments of the Directors on each of the four complaints asserted by GAF, Carbide adduced acceptable evidence, as explained below, on each of the challenged provisions.

### The Restrictive Covenants

Today, investment securities do not come pre-packaged in one standard form but instead are as varied as are the imaginations of those who market them. Formulating the terms of a security is a highly complex task, requiring both a solid understanding of the needs and resources of the company issuing the security (*e.g.*, its need for funds, prior indebtedness, cash flow, long-term growth plans, industry structure) and an awareness of the current investment market. Consequently, the terms of these investment securities vary wildly. Inevitably, only some of these marketing strategies are successful and are greeted with acceptance by investors. Courts, therefore, should be very circumspect in entering this area at the behest of a tender offeror and declaring some of these methods of raising capital proper, some improper, unless there is *no reasonable business justification*, evaluated according to that particular company's situation, for the restrictions placed in the debt instruments. Whether the covenants have an ancillary effect on the tender offeror's plans for the target company is irrelevant, even if that effect was intended.

The Carbide Board was advised by competent experts and believed that the covenants in the debt instruments proposed in the Exchange Offer were fair and reasonable and had acceptance in the marketplace. Those covenants, designed to protect the credit value of the debt securities, placed a limitation on the amount of assets that can be sold each year, a limitation on future debt, and the non-callability of the senior notes for various terms of years.

The Board was similarly advised and believed that the covenants would support an

investment grade rating for the debt securities; that advice was vindicated on December 23, 1985, when Moody's gave the debt securities a rating of BAA3, an investment grade rating. The Board was concerned that the shareholders receive a debt security that would retain its value, an obligation that was backed by the assets and cash flow of Carbide. Even if the 70% Exchange took place, the Board was competently advised and believed that the Company could be operated, debt could be serviced, and growth could be sustained under the covenants. There was no credible showing to the contrary.

Self-evidently, the covenants will never come into effect unless the shareholders select the Carbide offer and do not tender to GAF. GAF is not prevented by the Exchange Offer from raising its bid and satisfying the question of its acceptability to control in order to defeat the Exchange Offer or from financing its offer through equity markets or long-term debt.

### The Asset Sale Limit

Under the Exchange Offer, sales of as much as $1.7 billion of assets would be permitted, the first year, if the 35% Exchange takes place. Assuming that the 70% Exchange took place, the Company could sell 5% of Carbide's consolidated adjusted net assets, i.e., approximately $310 million in the first year. While these figures would not pay off GAF's debt to secure control, the Board had no obligation to facilitate the dismemberment of Carbide by exposing it to wholesale liquidation of its divisions to achieve a greater amount of cash. The asset sales limits were a reasonable term, appropriate in the Board's judgment to enable legitimate restructuring in an atmosphere of continuing the enterprise. There was no showing otherwise.

### The Limitation of Debt

Assuming that the 35% Exchange is consummated, Carbide would be free to take on an additional $1.1 billion in senior debt under the "basket" exception to the debt limit test. No additional senior debt could be taken on were there a 70% Exchange consummated. The Board, however, was competently advised and believed that this restriction is not at all unusual for a company that is highly leveraged. There was no showing against this reasonable assumption.

The limit on debt does not apply to debt used for working capital purposes, providing that the principal amount of such debt did not exceed 10% of Consolidated Adjusted Net Assets. As of September 30, 1985, this would have allowed borrowings of $600 million under either a 35% or a 70% Exchange. The Company may also borrow an additional unlimited amount of subordinated debt, and may borrow any amount to refinance existing debt.

### Redemption

GAF made a point of the non-callability of the debt securities in Carbide's offer for periods of four, five, and seven years. In response to the point that there is no escape from the covenants, Carbide pointed out that either it or GAF could, under the Indenture, make a tender or exchange offer for the debt securities in which the acceptance under such offer is conditioned upon execution and delivery of written consents to amendment of the Indenture on the debt securities. That would effectively permit redemption of some or all of the debt securities prior to their redemption dates. At the hearing, GAF's own expert conceded that such an offer could accomplish the same result as a call provision, and that the requisite 80% of the consents would command a premium as low as 12%, the amount of a typical call premium.

### Other Objections

The remaining three actions of the Board complained of herein require little notice. They do not provide any substantial basis for attacking the reasonableness of the Board's decisions.

1. The two actions taken by the Board on July 24, 1985, involved the revision of the definition of a quorum at a shareholders meeting from 40% to a majority of those entitled to vote, and limited the call of a special meeting of the shareholders to the

Board of Directors, the Chairman, and the President. These actions are so self-evidently routine and within the wide latitude of business judgment afforded to a Board of Directors under New York corporate law, that no further notice thereof is required here. Indeed, the lower quorum requirements previously followed by Carbide were unusual. Regulating special meeting procedures aids in establishing an orderly means for submitting matters to shareholders and avoids precipitation of issues that are unnecessarily distracting and ill-timed.

2. The so-called "Pension Parachute" refers to the amendment to the Retirement Plan that allows the Board to vest, for the benefit of the participating employees and retired employees, amounts of corporate funds that are technically "excess" (sometimes created by revaluation of fund investments) in the event of an "unfriendly change of control."

In justification of the reasonableness of the Board's action, it was pointed out that it was desirable to retain this flexibility to enable the Board to increase the pension benefits as they had done three times in the past when no tender offer was on the horizon.

The amendment does nothing more than allow the Board to treat the pensioners equitably and fairly in the manner and in the measure in which past negotiated transactions enabled the Board to do. Under friendly terms, the interests of employees can be ironed out on the bargaining table with equity to all sides. It was the Board's judgment, which appears entirely reasonable, that it was prudent to reserve to itself this power in the event of an unfriendly assault on control to prevent a takeover bidder from jeopardizing future appropriate and necessary increases of pension benefits by his use of the funds to finance a takeover. Labor, at whatever level, should not be victimized or go unrequited by control contests. It is entirely reasonable for a Board to take such steps as will assure workers against such a possibility arising from the necessity for financing the obligations incurred in a control contest.

Moreover, as admitted by GAF in its post-hearing brief, at 14, this so-called "Pension Parachute" issue is, in reality, a non-issue. GAF, in its brief, concedes that this contested amendment to the Retirement Plan gives Carbide's Board no greater power than it possessed without the amendment:

But Carbide's board already had the power before adoption of the pension parachute to cause excess pension funds to vest whenever it chose. In the event of an "unfriendly" change in control, the board would still have the time to cause the surplus pension funds to vest before being replaced by a new board, if it believed this action to be in the best interest of the corporation. The pension parachute thus does not enhance the ability of Carbide to protect employees; it serves as a warning to "unfriendly" acquirors.

Carbide's Board of Directors has met its burden of going forward with proof of reasonableness and fairness that satisfies invocation of the Business Judgment Rule. *See Norlin Corp. v. Rooney Pace, Inc.*, 744 F.2d at 255, 264 (2d Cir.1984) (the Business Judgment Rule "affords Directors wide latitude in devising strategies to resist unfriendly advances" and to protect the legitimate interests of shareholders, employees and management). None of the steps taken by Carbide were steps forbidden by the law. *Cf. Turner Broadcasting System, Inc. v. CBS, Inc.*, No. 85–2617A, slip op. at 16–17 (N.D.Ga. Aug. 16, 1985). In administering the Business Judgment Rule in takeover contests, no inference of self-interest is to be drawn from the mere fact that an outside Director acts to defeat a hostile offer and that his action allows him to remain on the Board. *See Crouse-Hinds Co. v. InterNorth, Inc.*, 634 F.2d 690, 696, 702 (2d Cir.1980).

To entitle a tender offeror seeking a preliminary injunction against a rival offer for the stock of the corporation, it must show (1) irreparable damage from the act

sought to be restrained; and (2) either (a) a probability of its ultimate success on the merits, or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of hardships tipping decidedly toward the movant for preliminary relief. The plaintiff has not met either requirement.

■ Under the facts and circumstances herein, the Court will not undertake to decide whether the business transactions complained of were wise or unwise. It is sufficient to find that they were lawful and sustained with substantial reasons reached by independent Directors in the fair and reasonable exercise of their informed business judgment.

The motion for a Preliminary Injunction is denied.

The foregoing findings and conclusions, together with (1) the findings of fact agreed upon by the parties, (2) the findings stamped "Found" on the proposed findings of the respective parties and (3) the conclusions set forth following the defendant's proposed findings, jointly shall constitute the findings of fact and conclusions of law required by Rule 52(a), Federal Rules of Civil Procedure.

So Ordered.

### AGREED FINDINGS OF FACT

**A.  *The Parties and Jurisdiction***

**1.  *GAF*.**

1.  Plaintiff GAF Corporation is a Delaware corporation with its principal executive offices in Wayne, New Jersey. GAF Corporation is active in the manufacture of specialty chemicals and building materials. Its common stock is traded on the New York Stock Exchange. The other plaintiffs, each Delaware corporations with their principal executive offices in Wayne, New Jersey, are direct or indirect wholly-owned subsidiaries of GAF Corporation. (PX 10). Plaintiffs (collectively, "GAF") are beneficial owners of 6,961,000 shares of Union Carbide common stock out of 67,283,319 shares outstanding as of December 13, 1985.

**2.  *Union Carbide*.**

Union Carbide Corporation ("Union Carbide") is a New York corporation with its principal executive offices in Danbury, Connecticut. Union Carbide is active in five industry segments: Petrochemicals; Industrial Gases; Metals and Carbon Products; Consumer Products; and Technology, Services and Specialty Products. (PX. 1). Its common stock is traded on the New York Stock Exchange and other exchanges.

**3.  ·*The Directors of Union Carbide*.**

Union Carbide has 4 inside and 11 outside directors. They are, in alphabetical order (PX 9):

| | |
|---|---|
| Warren M. Anderson | Chairman and Chief Executive Officer ("CEO") of Union Carbide. |
| John J. Creedon | President and CEO of Metropolitan Life Insurance Company. |
| Roberto de Jesus Toro | Director and Chairman of the Executive Committee of Banco de Ponce. |
| Alec Flamm | Vice Chairman of Union Carbide. |
| Harry J. Gray | Chairman & CEO of United Technologies Corporation. |
| James M. Hester | President, The New York Botanical Gardens. |
| Jack B. Jackson | Retired President of J.C. Penney Company. |
| Horace C. Jones | Director and Chairman of Finance-Pension Committee of Burlington Industries. |
| Robert D. Kennedy | President of Union Carbide Chemicals and Plastics Group. [Not a party to this action.] |
| Ronald Kuehn | Director and President of Sonat, Inc. |
| C. Peter McColough | Chairman of the Board of Xerox Corporation. |
| William S. Sneath | Retired Chairman and CEO of Union Carbide. |
| Heinn F. Tomforhde III | President of Union Carbide Consumer and Industrial Products and Service Groups. [Not a party to this action.] |
| Russell E. Train | President, World Wildlife Fund. |

Kathryn D. Wriston     Director of various corporations, including: Federated Department Stores, Inc., Santa Fe Southern Pacific Corporation.

4. Union Carbide's non-management, outside directors are persons of substance and position in the community whose financial and personal standing is not dependent on their continuing to be directors of Union Carbide.

5. The amount in controversy exceeds $10,000 exclusive of interest or costs. The Court has jurisdiction of this action under 28 U.S.C. § 1332.

### B. GAF's Purchase of Union Carbide Shares

6. On August 16, 1985, GAF filed a Schedule 13D with the Securities and Exchange Commission stating that GAF had acquired nearly 4 million, or 5.6%, of the then 70 million Union Carbide shares outstanding. (PX 5). On August 23, 1985, GAF filed Amendment No. 1 to its Schedule 13D, which reported that GAF had increased its holdings in Union Carbide to 5,007,600 shares, or 7.1% of the Union Carbide shares outstanding. (PX 6).

7. On August·29, 1985 GAF filed a second amendment to its Schedule 13D. (PX 7). GAF reported that it had raised its holdings to 6,961,000 shares, or 9.9% of Union Carbide's then outstanding stock.

### C. The Retirement Plan and By-Law Amendments

8. On July 24, 1985, Union Carbide's board of directors amended Union Carbide's Retirement Program Plan to provide that:

5.8 Increase in Accrued Benefits in Event of Unfriendly Change In Control. Notwithstanding any other provisions of the Plan, in the event of an Unfriendly Change in Control (as hereinafter defined) the Accrued Benefits of Participants and Beneficiaries may be increased as provided in this Section 5.8. The Board shall determine the manner and extent to which such Accrued Benefits will be increased. The increase in Accrued Benefits shall be determined on a non-discriminatory basis and the aggregate increase in the present value of the Accrued Benefits may be an amount up to but not exceeding the excess, as of the date of such Unfriendly Change In Control, of the fair market value of assets of the Plan over the present value of all Accrued Benefits hereunder (determined without regard to this section as as if the Plan had terminated immediately prior to such Unfriendly Change In Control). (PX 8 at Ex. 2 (the "Amendment"))

9. The Amendment defines an "Unfriendly Change in Control" as follows:

For purposes of this Section 5.8, an Unfriendly Change In Control shall occur if (i) a change in control of the Corporation would be required to be reported in response to Item 1(a) of the Current Report on Form 8–k, as in effect on the date hereof, pursuant to Sections 13 or 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), whether or not the Corporation is then subject to such reporting requirement; (ii) any "person" or "group" within the meaning of Section 13(d) and 14(d)(2) of the Securities Exchange Act of 1934, (the "Act") becomes the "beneficial owner" as defined in Rule 13d–3 under the Act of more than 35% of the then outstanding voting securities of the Company, otherwise than through a transaction or transactions arranged by or consummated with the prior approval of, the Board; or (iii) during any period of twenty-four consecutive months (not including any period prior to the adoption of this section), Present Directors and/or New Directors cease for any reason to constitute a majority of the Board. For purposes of subsection (iii) of the preceding sentence, "Present Directors" shall mean individuals who at the beginning of such consecutive twenty-four month period were members of the Board and "New Directors" shall mean any director whose election by the Board or whose nomination for election by the Company's stockholders was approved by a vote of at least two-thirds of the Directors then still

in office who were Present Directors or New Directors. (PX 8 at Ex. 2, p. 2)

10. The Amendment also provides:

Notwithstanding any other provisions of the Plan, the provisions of this Section 5.8 may not be amended after the date an Unfriendly Change In Control occurs without the written consent of a majority in number of Participants and Beneficiaries. The Board reserves the right to amend or eliminate this Section 5.8 prior to the date of an Unfriendly Change In Control. (PX 8 at Ex. 2, pp. 2–3)

11. At the July 24, 1985 Board meeting three outside directors (Messrs. Creedon and Ferguson and Mrs. Wriston) abstained from voting on the Amendment.

12. At the same board meeting on July 24, 1985, the Union Carbide directors also amended the Company by-laws to delete provisions allowing 25% of Union Carbide shareholders to call a special meeting of stockholders. Instead, special stockholder meetings may now be called by Union Carbide's chairman, president or Board of Directors. (*See* PX 3; PX 15).

C. *The GAF Offer*

13. GAF's tender offer seeks 48 million Union Carbide shares (representing, together with the shares already owned by GAF, approximately 80% of all Union Carbide's outstanding shares) at $68 per share in cash. In its offer to purchase (PX 10), GAF stated that it planned to follow the tender offer by a merger in which the remaining Union Carbide shares would be exchanged for preferred stock to be valued at approximately $68 per share, or $68 per share in cash if Union Carbide's Board of Directors shall have approved the GAF offer and entered into a definitive merger agreement. (PX 10). On December 13, 1985, GAF amended its offer to state that it intends to pay $68 per share cash in the proposed second-step merger. (PX 11).

14. The GAF Offer is conditioned upon, among other things, the tender of a minimum of 31 million shares and GAF's obtaining loans sufficient to pay for acquisition of shares under the offer. GAF proposes to obtain the approximately $3.85 billion necessary to consummate its tender offer through (i) the placement of at least $2.35 billion of debt securities by its financial advisor Drexel Burnham Lambert Incorporated and (ii) a bank loan facility of up to $1.5 billion from a syndicate of banks or other financial institutions. (PX 10, at 17; Heyman Tr. 234–35).

D. *The Exchange Offer*

15. The Union Carbide Board met on December 13 and December 15, 1985. At the December 15 meeting, the board concluded that in its view, the GAF offer was "grossly inadequate and unfair" and recommended that the shareholders reject the GAF offer. (PX 8, at 4).

16. In response to the GAF offer, on December 17, 1985 Union Carbide commenced an exchange offer (the "Exchange Offer") to purchase 35% of its own shares (the "35% Exchange") for a package of cash and debt securities stated by Union Carbide to have an expected value of $85 per share, with an additional 35% to be purchased if GAF should acquire 20,200,000 shares, approximately 30% of Union Carbide's shares (the "70% Exchange"). The purchase price is composed of $20 per share in cash and a package of debt securities consisting of $25 Principal Amount of Senior Debentures due 2006, $20 principal amount of Senior Notes due 1993 and $20 Principal Amount Senior Notes due 1996 (collectively, the "debt securities"). (PX A, at 33–34).

E. *The Covenants*

17. The debt securities are to be issued pursuant to an Indenture (the "Indenture") (PX 16), dated as of December 1, 1985. The Indenture contains certain provisions and covenants, as set forth below, which have been challenged by GAF. The Indenture is presently in draft form and has been filed with the Securities Exchange Commission pursuant to the Trust Indenture Act of 1939.

### 1. *Issuance of Securities*

18. The draft Indenture limits the aggregate amount of debt securities to be issued under the Indenture to a total of $3.1 billion, the amount of debt necessary to consummate the 70% Exchange. Such securities may be issued only upon resolution approved by Union Carbide's Independent Directors, as defined in the Indenture. (PX 16 § 2.01, at 5). Section 1.01 of the Indenture defines an "Independent Director" as a director

> who is not, and never has been, an employee of the Company and who either was a member of the Board of Directors of the Company on December 1, 1985 or who became a director of the Company subsequent to such date and whose election, or nomination for election by the Company's shareholders, was Duly Approved by the Independent Directors whether by a specific vote or by approval of the proxy statement issued by the Company on behalf of the Board of Directors in which such person is named as nominee for director, without due objection to such nomination.

### 2. *Redemption*

19. The Senior Debentures due 2006 (the "Debentures") will be subject to redemption at the option of Union Carbide on terms and at a premium set forth in the debentures at any time on or after January 31, 1993. The Senior Notes due 1993 (the "Seven Year Notes") will be subject to redemption at the option of Union Carbide at 100% of their principal amount, together with accrued interest to the redemption date at any time after January 31, 1990. The Senior Notes due 1996 (the "Ten Year Notes") will be subject to redemption at the option of Union Carbide at 100% of their principal amount, together with accrued interest to the redemption date at any time after January 31, 1991. (DX A, at 33–34).

20. Under the Section 9.02(a) of the Indenture, amendments to the Indenture, including waiver of the above covenants, may be made only if holders of eighty per cent of the principal amount of each series of debt securities consent.

### 3. *The Limitation on Debt*

21. The Parties have not reached agreement on Section 4.02 of the Indenture. (PX 16 § 4.02, at p. 21–22).

### 4. *Restriction on Dividends and Investments*

22. Sections 4.03(c) and 4.04(c) of the Indenture provide that the total of all dividends (other than dividends payable only in Union Carbide shares) on Union Carbide stock, plus stock repurchases of Union Carbide stock (other than those made through the Exchange Offer or similar redemptions as set forth in the definition of Restricted Payment), plus Investments by Union Carbide and its Subsidiaries in any entity (other than a wholly-owned subsidiary) made after December 31, 1985 is limited to the sum of (i) $20 million plus (ii) proceeds received by Union Carbide from the issuance of stock issued after December 31, 1985, plus (iii) 50% of·Union Carbide consolidated net income (less all consolidated net losses) accrued after December 31, 1985. If less than $2 billion in debt securities have been issued and are outstanding, this restriction does not apply to cash dividends paid on Union Carbide stock which do not exceed $.85 in any calendar quarter. (PX 16 § 4.03(c) ). However, if more than $2 billion in debt securities have been issued and are outstanding, for so long as any of the debt securities are outstanding, cash dividends paid on Union Carbide stock are included in the total of restricted dividends described above. (PX 16 § 4.04(c) ).

### 5. *Restriction on Asset Sales*

23. The restrictions in the Indenture on asset sales differ depending on whether or not $2 billion in aggregate principal amount of debt securities have been issued under the Indenture:

(i) *Less than $2 billion securities issued.* In case less than $2 billion of debt securities have been issued, under Section 4.03(d), Union Carbide and its Subsidiaries

may not transfer any assets, except for sale and leaseback transactions permitted by Section 4.04(b) and transactions permitted by Article Five, other than (1) transfers in the ordinary course of business as conducted by Union Carbide and its Subsidiaries before the Original Issue Date under the Indenture; (2) transfers between Union Carbide and a domestic wholly-owned subsidiary or between such subsidiaries; and (3) transfers if the greater of either (x) the book value or (y) fair market value of the total transfers (utilizing the greater of book value or fair market value for each transfer) in the last 12 months does not exceed 25% of Consolidated Adjusted Net Assets (the "basket exception");*

(ii) *More than $2 billion of Securities issued.* Section 4.04(d) provides that if more than $2 billion Debt Securities have been issued, the restrictions described in subparagraph (i) above apply, except (1) the "basket exception" is reduced from 25% of Consolidated Adjusted Net Assets to 5% of Consolidated Adjusted Net Assets and (2) all proceeds from such sales can only be applied to reduce "Senior Funded Indebtedness"—debts of over one year maturity (at the time of determination) other than (1) lease obligations or (2) debt which is subordinate to the debt securities. (*See* PX 16 at § 4.01).**

6. *Restriction on Transactions with Affiliates*

24. Section 4.02(c) of the Indenture limits transactions between the Company and any "Restricted Affiliate"—any person that controls Union Carbide or an affiliate of such person (other than Union Carbide or a subsidiary of Union Carbide)—to (1) arms-length transactions of less than $10,-000,000 per year in the ordinary course of business or (2) any transactions or series of related transactions which involve an amount less than 2% of Consolidated Adjusted Net Assets, provided that an investment banker or appraiser determines the transaction to be at least as favorable to Union Carbide as an arm's length transaction.

## PLAINTIFFS' PROPOSED FINDINGS OF FACT

3. The individual defendants are directors of Carbide; all reside in states other than Delaware or New Jersey. Defendant Hester has been voluntarily dismissed.

5. In June and July, 1985, GAF began to purchase Carbide common stock in the open market. (PX 5, Sch. B (GAF 13D)) It had been speculated in the press that Carbide was a possible takeover candidate. (PX 2 (Wall Street Journal article))

*Carbide's Retirement Program Plan Amendment*

8. As of July, 1985, Carbide had in excess of a billion dollars in surplus funds in its Retirement Program Plan (i.e., pension plan). (II, 135 (Anderson))

9. The pension surplus consists of funds that were contributed to the pension plan out of shareholders' assets over the years. It exists as a surplus either because investment performance has been better than was projected or because actuarial assumptions changed—with the result that there is more money in the pension plan than is needed for the existing level of benefits.

17. At the board meeting of July 24, 1985, Carbide's general counsel stated that the purpose of the Amendment was to hinder hostile takeovers:

> Mr. Stichnoth [Carbide's general counsel] explained that, in addition to giving the Directors the authority to use excess

---

* This provision permits sales of assets made to repay borrowings under the credit facility Union Carbide uses to finance part of the Exchange Offer. (See PX 15 at 22) However, to the extent sales made to pay off the credit facility exceed 25% of Consolidated Adjusted Net Assets, the amount of transfers which may be made in the subsequent year will be reduced below 25% by such excess amounts. (PX 16 § 4.03(d).) In addition, sales of certain specific properties are excluded. (*Id.*).

** Sales of assets made to repay borrowings under the credit facility are treated similarly to the treatment described in the preceeding footnote, except for the change of the "basket" limit to 5%. (PX 16 § 4.04(d)).

pension fund assets for the benefit of pension plan participants under certain circumstances, the proposed provision also will make it more difficult for a third party to rely upon the excess pension fund assets to finance, directly or indirectly, an unfriendly acquisition or change in control of the Corporation unless the Board approves. (PX 15 (July 24, 1985 Bd. Minutes))

*The Carbide Restructuring Program*

21. On August 28, 1985, Carbide announced a "comprehensive restructuring program." Under this program, Carbide anticipated the sale of company assets of "at least $500 million." Carbide then stated that the sale of such assets, and the restructuring program in general, is the "most effective means of enhancing shareholders' value." (PX 14, Ex. (a)(7) (Carbide press release); *see* PX 10, at 12 (quoting Carbide press release))

22. As part of the restructuring program, Carbide also sought governmental permission to withdraw $500 million in surplus funds from its Retirement Program Plan. (PX 10 at 12; PX 14, Ex. (a)(7))

*Carbide's Key Employee Severance Agreements*

23. On October 22, 1985, Carbide's Board of Directors authorized the execution of "Severance Compensation Agreements" between Carbide and 42 executives. The employment agreements provided, *inter alia*, that if there was a "Change in Control" of Carbide, and these executives were thereafter terminated for reasons other than for cause, retirement, death or disability, then the terminated executives would receive a package of benefits including (1) accrued compensation; (2) extended insurance coverage; (3) a retirement pension in excess of the pension as ordinarily calculated; and (4) a lump sum payment equal to 2.99 times the executive's average annual taxable compensation for the past five years. In return, the executives agreed to remain in Carbide's employ for six months after any "potential change in control." (PX 8 at Ex. 3, pp. 9–16 (Severance Agreement))

24. Under the Severance Agreements, a "potential change in control" is deemed to have occurred when any person becomes a beneficial owner of over 9.5% of outstanding securities. (PX 8 at Ex. 3, p. 7) When the Severance Plan was adopted, GAF already owned 9.9% of Carbide's outstanding stock; hence, a potential change in control under the Plan had already occurred. (PX 8 at Ex. 3, p. 9; PX 7 (GAF 13D Amend. No. 2, dated August 29, 1985, disclosing GAF's ownership of 9.9% of Carbide's stock))

45. The Carbide Offer to Purchase states:

> The Board recognizes that the offer of cash and Securities pursuant to the Company [Carbide] Offer might inhibit the Bidders' [GAF's] ability to obtain financing for the GAF Offer by preventing or hindering the use of Company assets and earnings to finance the GAF Offer and could cause the Bidders to terminate the GAF Offer. (DX A at 7)

37. In its Offer to Purchase, Carbide sets forth three purposes for its Exchange Offer:

> (1) the exchange of 23,500,000 Shares pursuant to the Company Offer will be a valuable step in the Company's ongoing restructuring to enhance shareholder values; (2) to deter the grossly inadequate and unfair GAF Offer; and (3) in any event, to provide a superior financial alternative to the GAF Offer to shareholders who desire to sell Shares at this time.

## DEFENDANTS' POST–HEARING PROPOSED FINDINGS

8. In Item 4 to the Schedule 13D, entitled "Purpose of Transaction," GAF stated that on July 25, 1985, defendant Heyman had informed Union Carbide that GAF had merely taken an "investment position" in Union Carbide stock, that it intended to review its "investment" in the company on a continuing basis and that it intended "to increase its equity position in [Union Carbide] depending upon the price and avail-

ability of funds to GAF, subsequent developments affecting the Company [*i.e.*, Union Carbide], the Company's business and prospects" and other factors. GAF also asserted that in making its "investment" in Union Carbide shares it had considered the "possibility" of a business combination between GAF and Union Carbide, but that it had "made no determination to seek to effect such a business combination." (PX 6, at 7–8).

9. Although GAF amended its Schedule 13D, throughout the fall of 1985 GAF never modified its assertion that it was acquiring Union Carbide shares as an "investment" and never clarified its intentions as to its "investment." (PX 6, 7).

10. On September 10, 1985, Heyman met with Warren Anderson, Chairman and Chief Executive Officer of Union Carbide, and Alec Flamm, Vice Chairman of Union Carbide, and informed them that GAF had purchased shares of Union Carbide as an investment. At the meeting Heyman indicated that he was familiar with Union Carbide's restructuring program, which involved among other things the repurchase of shares and the sale of certain assets of Union Carbide (Anderson Tr. 123), and that he had no suggestions to augment the plan. (Anderson Tr. 151–52; PX 10, at 20).

11. In fact, during that same period, GAF had analyzed and consulted with investment bankers concerning an acquisition of Union Carbide. GAF had also commissioned industry consultants to study certain segments of Union Carbide's business. (Heyman Tr. 215). On December 9, 1985, GAF announced an intention to make a cash tender offer.

14. At the commencement of its offer, GAF had disclosed it had obtained one $150 million bank loan commitment and no commitments for the purchase of debenture bonds. (PX 10, at 17). By December 19, 1985, GAF had received only approximately $600 million in bank loan commitments and still had received no commitments for the purchase of debenture bonds. (Heyman Tr. 237).

15. In addition, in order to finance the acquisition of the remaining 20% of Union Carbide shares that would be left outstanding in the event that the GAF Offer is successful, GAF must raise another $900 million; no commitments of any kind have been received for any of those funds. (Heyman Tr. 237), as of the date of the hearings herein.

16. GAF also states that it intends to "repay substantial portions" of the bank and debenture bond acquisition debt by selling assets of Union Carbide. (PX 10, at 20). In the Offer to Purchase (PX 10, at 24) GAF states that it:

> intends to offer to sell substantially all of the Company's Consumer Products segment, the Metals and Carbon Products segment and a substantial number of the businesses in the Technology, Services and Specialty Products segment. In addition, GAF may determine, prior or subsequent to the Merger, subject to further evaluation, to terminate the Company's defined benefit pension plan and, thereafter recover the surplus assets therein.

GAF believes that it "may be able to realize, on an after-tax basis," between $3.77 billion and $4.5 billion from this break-up of Union Carbide, using the proceeds to reduce the acquisition indebtedness. (PX 10, at 24).

17. At the hearing Heyman testified that, although GAF did not "need to sell assets" to pay down the acquisition debt, GAF intended to pursue such sales because it regarded it as "certainly preferable that we do repay debt in order to create a more realistic debt-equity ratio" and because it wants "to refocus this company in areas it should be focusing on." (Heyman Tr. 228–29).

18. In the event that GAF were to succeed in acquiring Union Carbide at $68 per share and carry out its liquidation and debt repayment plan as set forth above, GAF would have acquired and retained Union Carbide's valuable industrial gas business and its chemical and plastics business at no cost. (Anderson Tr. 142).

C. *Union Carbide's Response to GAF's Offer*

19. The Board of Directors of Union Carbide met on Friday, December 13, 1985 to consider the GAF offer. (Gray Tr. 40). Also present at the meeting which convened at 9:00 A.M. and adjourned at 4:00 P.M. were Union Carbide's investment bankers Morgan Stanley & Co. Incorporated ("Morgan Stanley") and outside legal counsel, Sullivan & Cromwell. (Gray Tr. 40). At the meeting, Morgan Stanley reviewed with the Board their financial analysis of the proposed GAF offer and presented in detail financial analyses of each segment of Union Carbide's business. (Gray Tr. 40–41; DX D). Morgan Stanley also presented a valuation analysis of all of Union Carbide as a going concern and an analysis of the range of values that might be realized in a liquidation. (Gray Tr. 40–41; DX D). In each case, the price of $68 per share cash, even assuming it was for 100% of Union Carbide's shares and that there were no financing contingencies, was unfair to Union Carbide's shareholders from a financial point of view. (DX D, Volume dated December 13, 1985, Exs. VI & VII). Morgan Stanley also reviewed with the Board potential responses to the GAF offer, including the possibility of negotiating with GAF, acquiring GAF, seeking a "White Knight", selling certain assets of Union Carbide, and proposing a leveraged buy-out. The Board also received advice from its outside counsel concerning its duties and obligations under the Business Judgment Rule in responding to the GAF offer. (Gray Tr. 42). No action was taken at the meeting on December 13, and the board adjourned to consider the matter further and to review the materials presented by Morgan Stanley. (Gray Tr. 42).

20. On December 15, 1985, the Board reconvened, the meeting lasting from 10:00 A.M. to 3:30 P.M. (Gray Tr. 47). At the meeting, Morgan Stanley reviewed in summary form the financial analysis that had been presented on December 13, and advised the Board of its opinion that the GAF offer was unfair from a financial point of view. (Gray Tr. 44). The Board again received advice from outside counsel on its legal obligations, including the duties of Board members under the Business Judgment Rule. (Gray Tr. 44). After those presentations, the inside directors left the meeting, and the outside directors met with Morgan Stanley and Sullivan & Cromwell, questioning them and reviewing with them the matters which had previously been discussed. (Gray Tr. 40). The inside directors then rejoined the meeting, and the Board of Directors unanimously rejected the GAF offer as grossly inadequate and unfair. (Gray Tr. 44). The Board first concluded that $68 per share all cash, cash in hand, was grossly inadequate. (Anderson 160). In confirming its decision, the Board took into account that GAF had only $150 million in financing commitments, less than 4% of the acquisition price. (PX 10, at 17; Anderson Tr. 160). The Board also considered the effect of the GAF offer on the company itself, as well as on its employees, creditors, customers and suppliers and the communities where the company operates, since GAF had announced an intention to dispose of significant assets of the company in a relatively short period of time. (PX 8, at 5).

21. The Board then resumed discussing alternatives to the GAF offer, and after a thorough analysis of its alternatives the Board concluded that the best alternative for the shareholders was the commencement of an exchange offer. (Gray Tr. 45).

23. The terms of the Exchange Offer do not exclude GAF from tendering its holdings into the offer.

24. The Board's objectives in approving the Exchange Offer were as follows. First, the Board's purpose in approving the 35% Exchange, regardless of GAF's acquisition of shares, was to provide Union Carbide shareholders with a superior financial alternative to GAF's offer. (Gray Tr. 48–49; Anderson Tr. 148, 158, 161). The Board had been advised by Morgan Stanley that the "blended" value of the 35% Exchange, when considering the exchange of

35% of Union Carbide's stock at $85 per share and the trading value of the remaining 65%, would be in the $75–80 per share range. (Anderson Tr. 161). Morgan Stanley had advised the Board that after consummation of the 35% Exchange (in which shareholders would receive $85 for a little over a third of their shares) Union Carbide shares could be expected to trade in the low $70's range. (Anderson Tr. 162).

25. The Board's purpose in authorizing the 70% Exchange was to insure that if—contrary to the Board's view of the best interests of the company and its various constituencies—Union Carbide is to be transformed into a highly leveraged enterprise to obtain short-term profits, those short-term profits will flow to Union Carbide's current shareholders, not to GAF. (DX A at 6; Gray Tr. 49).

26. In addition, the Board's purpose in approving the offer was to deter the GAF offer which it regarded as grossly inadequate and unfair, and which, because of GAF's peculiar financial circumstances, GAF must finance by using Union Carbide's own assets and borrowing power. (Gray Tr. 48, 93; Anderson Tr. 148–50). In particular, the Board of Directors was concerned that GAF could acquire valuable businesses of Union Carbide at no cost by pursuing its liquidation strategy. (Anderson Tr. 142).

## D. *The Covenants*

### 1. *Issuance of Securities*

28. The draft Indenture limits the aggregate amount of debt securities to be issued under the Indenture to a total of $3.1 billion, the amount of debt necessary to consummate the 70% Exchange. Such securities may be issued only upon resolution approved by Union Carbide's Independent Directors, as defined in the Indenture. (PX 16 § 2.01, at 5). Section 1.01 of the Indenture defines an "Independent Director" as a director

who is not, and never has been, an employee of the Company and who either was a member of the Board of Directors of the Company on December 1, 1985 or who became a director of the Company subsequent to such date and whose election, or nomination for election by the Company's shareholders, was Duly Approved by the Independent Directors whether by a specific vote or by approval of the proxy statement issued by the Company on behalf of the Board of Directors in which such person is named as nominee for director, without due objection to such nomination.

29. This provision enables the current Board of Directors to consummate the entire 70% Exchange by appropriate resolutions for each 35% tranche and insures that if only the 35% Exchange is consummated (requiring the issuance of approximately $1.55 billion of debt securities) no additional debt ranking equally with that issued under the Indenture in the 35% Exchange may be issued except by action of the Independent Directors. In short, the provision preserves the relative priority of the debt securities to be issued in the Exchange Offer.

### 2. *Redemption*

32. As required, in part, by Section 316(a) of the Trust Indenture Act, 15 U.S.C. § 77 ppp(a), and in conformance with the American Bar Foundation Model Debenture Indenture, see American Bar Foundation, Commentaries on Model Debenture Indenture Provisions 41–42 (1967), and with the Model Simplified Indenture § 2.09, 38 Bus.Law. 745, 752–53 (1983), the draft Indenture provides that in calculating whether the holders of the required principal amount have concurred in any consent, debt securities owned by the company or any of its affiliates shall be disregarded. (PX 16 § 2.11, at p. 11).

33. Union Carbide stipulated on the record at the hearing, however, that under the Indenture, the company or one of its affiliates could make a tender or exchange offer for the debt securities in which the acceptance of securities for purchase under such offer would be conditioned upon execution and delivery of written consents to

amendment of the redemption provisions of the Indenture and the debt securities. (Tr. 155–56). In this way, the company, or one of its affiliates, can effectively redeem some or all of the debt securities prior to their redemption dates and thereby obtain release from some or all of the covenants.

### 3. *The Limitation on Debt*

34. Under Section 4.02 of the Indenture (PX 16 § 4.02, at p. 21–22), the amount of senior debt the company (or any subsidiary, as defined) will be permitted to incur will be limited to an amount equal to 75% of the sum of Consolidated Adjusted Net Assets ("CANA"), as defined, and short term debt of the company and its subsidiaries. This limit, however, does not apply to, among other things, debt used for working capital purposes provided that the principal amount of such debt shall not exceed 10% of CANA. (PX 16 § 4.02(b)(iv), at p. 22; Anderson Tr. 164). Accordingly, for working capital purposes the company may borrow an additional $600–700 million. (*See* paragraph 36, *infra*). The company may also borrow an additional unlimited amount of subordinated debt. (PX 16 § 4.02(b)(vi), at p. 22). Finally, the company may borrow any amount to refinance existing debt. (PX 16 § 4.02(b)(vii)–(viii), at p. 22).

### 4. *Restriction on Asset Sales*

35. The restrictions in the Indenture on asset sales differ depending on whether or not $2 billion in aggregate principal amount of debt securities have been issued under the Indenture:

(i) *Less than $2 billion securities issued.* In case less than $2 billion of debt securities have been issued, under Section 4.03(d), Union Carbide and its subsidiaries may not transfer any assets, except for sale and leaseback transactions permitted by Section 4.04(b) and transactions permitted by Article Five, other than (1) transfers in the ordinary course of business as conducted by Union Carbide and its Subsidiaries before the Original Issue Date under the Indenture; (2) transfers between Union Carbide and a domestic wholly-owned subsidiary or between such subsidiaries; and (3) transfers if the greater of either (x) the book value or (y) fair market value of the total transfers (utilizing the greater of book value or fair market value for each transfer) in the last 12 months does not exceed 25% of CANA (the "basket exception"); [1]

(ii) *More than $2 billion of securities issued.* Section 4.04(d) provides that if more than $2 billion of debt securities have been issued, the restrictions described in subparagraph (i) above apply, except (1) the "basket exception" is reduced from 25% of CANA to 5% of CANA and (2) all proceeds from such sales can only be applied to reduce "Senior Funded Indebtedness"—debts of over one year maturity (at the time of determination) other than (1) lease obligations or (2) debt which is subordinate to the debt securities (*See* PX 16 § 4.01).[2]

### 5. *Calculations of Permissible Amounts under the Senior Debt and Asset Sale Tests in the Indenture*

36. Using the "Case A" (35% Exchange) and "Case B" (70% Exchange) pro forma September 30, 1985, balance sheet figures stated at page 30 of the Union Carbide Offer to Purchase (DX A, at 30), CANA is computed as follows:

---

**1.** This provision permits sales of assets made to repay borrowings under the credit facility Union Carbide uses to finance part of the Exchange Offer. (See PX 15, at 22) However, to the extent sales made to pay off the credit facility exceed 25% of Consolidated Adjusted Net Assets, the amount of transfers which may be made in the subsequent year will be reduced below 25% by such excess amounts. (PX 16 § 4.03(d)). In addition, sales of certain specific properties are excluded. (*Id.*).

**2.** Sales of assets made to repay borrowings under the credit facility are treated similarly to the treatment described in the preceeding footnote, except for the change of the "basket" limit to 5%. (PX 16 § 4.04(d)).

|                      | Case A         | Case B         |
| -------------------- | -------------- | -------------- |
| Total Assets         | $10.1 billion  | $10.1 billion  |
| Current Liabilities  | − 3.2 billion  | − 3.7 billion  |
|                      | 6.9 billion    | 6.4 billion    |
| Prepaid Expenses     | − .1 billion   | − .1 billion   |
|                      | 6.8 billion    | 6.3 billion    |
| Deferred Charges [3] | −.07 billion   | −.07 billion   |
|                      | $ 6.7 billion  | $ 6.2 billion  |

The senior debt test ("basket exception") at page 34 of the Offer to Purchase (DX A, at 34) is as follows:

|                | Case A         | Case B         |
| -------------- | -------------- | -------------- |
| CANA           | $ 6.7 billion  | $ 6.2 billion  |
| Short-Term Debt | + 1.6 billion | + 2.1 billion  |
|                | $ 8.3 billion  | $ 8.3 billion  |
| 75%            | $ 6.2 billion  | $ 6.2 billion  |
| Long-term debt | − 3.5 billion  | − 5.0 billion  |
|                | 2.7 billion    | 1.2 billion    |
| Short-term debt | − 1.6 billion | − 2.1 billion  |
| "Freeboard"    | $ 1.1 billion  | 0              |

The sale of assets tests ("basket exception") at pages 37–38 of the Offer to Purchase is as follows:

|           | Case A         | Case B         |
| --------- | -------------- | -------------- |
| CANA      | $ 6.7 billion  | $ 6.2 billion  |
| 25% (5%)  | $ 1.7 billion  | $ 310 million  |

### 7. *Restriction on Transactions with Affiliates.*

38. Section 4.02(c) of the Indenture limits transactions between the Company and any "Restricted Affiliate"—any person that controls Union Carbide or an affiliate of such person (other than Union Carbide or a subsidiary of Union Carbide)—to (1) arms-length transactions of less than $10,000,000 per year in the ordinary course of business or (2) any transactions or series of related transactions which involve an amount less than 2% of Consolidated Adjusted Net Assets, provided that an investment bank or appraiser determines the transaction to be at least as favorable to Union Carbide as an arm's length transaction.

### E. *The Purpose of the Covenants*

39. The primary purpose of the covenants was to insure that the notes would trade at their stated value and that they would be of investment grade quality. (Gray Tr. 76, 93; Anderson Tr. 149). The Board was advised by Morgan Stanley that the covenants would support such a rating. (Gray Tr. 94). In particular, the Board was

3. Reported on the September 30, 1985 pro forma balance sheet as part of "Other Assets."

concerned that its shareholders would receive debt securities backed by the assets and cash flow of Union Carbide's businesses so that the debt securities will hold their value during the period they remain outstanding. (Anderson Tr. 149–50; Gray Tr. 93).

40. Moreover, the Board was advised by Morgan Stanley, and reasonably believed that the company could meet its debt service and provide for its future growth even assuming the 70% Exchange was made and the covenants therein became effective. (Gray Tr. 45, 95–96).

41. The board also intended that the covenants deter GAF's offer and any other offer that would use Union Carbide's assets and borrowing capacity as the basis for its financing. (Gray Tr. 93; Anderson Tr. 149).

42. The debt securities have in fact been given an investment grade rating of BAA3 by Moody's Investors Service, Inc.

43. Covenants of this type have been used in other transactions in which the board of directors of a target corporation has sought to insure that the benefits of a highly leveraged transactions flow to its shareholders, including one transaction in which GAF's expert's own firm was the financial advisor. (DX B, C; Lowry Tr. 202–06).

### F. *The Effect of the Covenants*

44. The covenants do not discriminate against GAF or its offer. Assuming the Exchange Offer is consummated, the covenants apply regardless of who owns or controls Union Carbide. (DX A, at 34–44; Heyman Tr. 251). The covenants do not, and cannot, restrict GAF's ability to raise money on the strength of its own assets or credit. (Anderson Tr. 158, 166). GAF's only alleged grievance is that the covenants, if they come into effect, could interfere with its particular financing plan for acquiring Union Carbide, which includes asset liquidation. (Heyman Tr. 253).

G. *The Amendments to the By-Laws and Retirement Plan*

47. On July 24, 1985, the Union Carbide Board of Directors voted to amend the Union Carbide by-laws so as to raise the quorum at a shareholders' meeting from 40% to a majority of the holders of shares entitled to vote at such a meeting. The Board also amended the by-laws to limit those who may call a special meeting of stockholders to the Board of Directors, the Chairman and the President.

48. Mr. Gray testified that the prior procedures embodied in the by-laws were unusual in that they permitted action to be taken by a majority of a minority. (Gray Tr. 50). The amendments to the quorum requirement were made to rectify that situation. The amendments limiting the call of a special meeting were intended to insure that matters were placed before shareholders in an orderly manner at an agreed-upon time. (Gray Tr. 50).

49. Also on July 24, 1985, the Board approved an amendment to the Retirement Program Plan for Employees of Union Carbide Corporation and its Participating Subsidiary Companies ("Retirement Plan"). The amendment empowers the Board, in the event of a non-negotiated, "unfriendly change of control" to vest for the benefit of plan participants any funds that are technically in excess of the Plan's requirements according to actuarial calculations. (PX 8, at Ex 2.)

50. Union Carbide now has in its Retirement plan approximately $300 million in excess funding, taking into account some $500 million in excess funding that Union Carbide has already sought to recover from the Plan. (Gray Tr. 51; Anderson Tr. 128, 133).[4] The Board has elected to leave the approximately $300 million in excess in the Retirement Plan to fund increases in the level of benefits to the members of the Plan. (Gray Tr. 52; Anderson 124–29).

51. Under the amendment, the Board retains the flexibility to assure that tradi-

tional increases to the Retirement Plan would not be jeopardized in the event of a non-negotiated change of control. (Gray Tr. 52; Anderson Tr. 131). The amendment was also intended to keep those funds out of the hands of a corporate raider. (Gray Tr. 72). As of now, the Board has not taken any action pursuant to the amendment. (Anderson Tr. 125).

52. At the hearing, GAF, through its Chairman Heyman, indicated that it was not prepared to say that if GAF were deprived of the opportunity of getting the $500 million it would go forward with the offer. (Heyman Tr. 227).

## CONCLUSIONS OF LAW

1. The defendant directors acted within their power in commencing the Exchange Offer to repurchase shares of Union Carbide. N.Y.Bus.Corp.L. § 513; *Turner Broadcasting System, Inc. v. CBS, Inc.,* No. 85–2617A, slip. op. (N.D.Ga. Aug. 15, 1985).

2. The defendant directors acted within their power in amending the by-laws of Union Carbide to provide for a majority quorum and to eliminate the right of minority shareholders to call a special meeting of shareholders. N.Y.Bus.Corp.L. §§ 601(a), 602(c), 608(b).

3. The defendant directors acted within their power in adopting the amendment the Retirement Plan. N.Y.Bus.Corp.L. § 701.

4. The business judgment rule protects from judicial scrutiny the decisions of a board of directors when the board acts with the exercise of reasonable judgment, fairness, due care and without self-interest, bad faith or fraud. *E.g., Crouse-Hinds Co. v. InterNorth, Inc.,* 634 F.2d 690 (2d Cir. 1980); *Auerbach v. Bennett,* 47 N.Y.2d 619, 419 N.Y.S.2d 920, 393 N.E.2d 994 (1979).

5. The business judgment rule applies to actions taken by directors in responding

---

**4.** Mr. Anderson later testified that as of September 16, 1985, the total surplus before withdrawal of the $500 million that is being recovered "was believed to be somewhat in excess of a billion dollars." (Anderson Tr. 135).

to unsolicited takeover offers. *E.g., Norlin Corp. v. Rooney, Pace, Inc.*, 744 F.2d 255 (2d Cir.1984); *Buffalo Forge Co. v. Ogden Corp.*, 717 F.2d 757 (2d Cir.), *cert. denied*, 464 U.S. 1018, 104 S.Ct. 550, 78 L.Ed.2d 724 (1983); *Crouse-Hinds Co. v. InterNorth, Inc.*, 634 F.2d 690 (2d Cir. 1980).

6. Plaintiffs have failed to adduce any evidence of self-interest, bad faith or fraud so as to subject defendants' actions to judicial scrutiny under the business judgment rule. *See Buffalo Forge, supra; Crouse-Hinds, supra; Auerbach v. Bennett*, 47 N.Y.2d 619, 419 N.Y.S.2d 920, 393 N.E.2d 994 (1979).

7. The Union Carbide Board's decision to reject GAF's offer as grossly inadequate and unfair was a reasonable and informed exercise of the Board's business judgment.

8. The Union Carbide Board's decision to provide its shareholders with a superior financial alternative by authorizing the Exchange Offer was a reasonable and informed exercise of the Board's business judgment.

9. The Union Carbide Board's approval of the terms of the Exchange Offer, including the covenants contained in the proposed Indenture governing the debt securities to be exchanged, was a reasonable and informed exercise of business judgment.

10. The Union Carbide Board had no legal obligation, as a fiduciary or otherwise, to set the terms of the Exchange Offer with regard to their effect on GAF's ability to use the assets and cash flow of Union Carbide to borrow money to finance its offer or on GAF's plans to liquidate certain assets of Union Carbide.

11. The Union Carbide Board's decision to amend its Retirement Plan to give the Board the option to vest any excess pension funds in the pension plan in the event of an unfriendly change in control was a reasonable and informed exercise of business judgment.

12. The Union Carbide Board of Directors has no legal obligation, fiduciary or otherwise, to enable GAF to use excess assets in its Retirement Plan to finance the acquisition of Union Carbide.

13. The Union Carbide Board's decision to amend its by-laws with respect to quorum requirements and special meetings were reasonable and informed exercises of business judgment.

14. By reason of the foregoing Conclusions, plaintiffs can show neither (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward plaintiffs. *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70 (2d Cir.1979) (per curiam).

15. Because GAF remains free to compete with, and to defeat if it can, the Exchange Offer in the market, it is threatened with no irreparable injury in the absence of a preliminary injunction against the Exchange Offer.

16. Because Union Carbide has neither taken nor threatened to take any action with respect to any excess pension funds GAF is not threatened with any irreparable injury in the absence of an injunction against the Retirement Plan amendments.

17. Because GAF has neither sought nor presented evidence that it intends to seek a special meeting of shareholders, it is threatened with no irreparable injury in the absence of an injunction against the by-law amendments.

18. Union Carbide's public shareholders would be irreparably injured by the issuance of an injunction against the Exchange Offer since they would thereby be deprived of the only available alternative to GAF's tender offer.

So Ordered.