**In re UNION CARBIDE CORPORATION CONSUMER PRODUCTS BUSINESS SECURITIES LITIGATION.**

This Document Relates to: All Actions.

No. MDL 692 (CLB).

United States District Court, S.D. New York.

Sept. 4, 1987.

Harry Abrevaya, Evelyn H. Summers and Charles S. Tanenbaum.

Dianne M. Nast, Kohn, Savett, Klein & Graf, P.C., Philadelphia, Pa., Elwood S. Kendrick, Elwood S. Kendrick, Inc., Los Angeles, Cal., for Selden Ring.

John S. Martin, Jr., Schulte Roth & Zabel, New York City, for Alfred E. Dudley and Alan C. Egler.

Kenneth H. Hanson, Chicago, Ill., for Richard James Stevens.

Raymond L. Falls, Denis McInerney, David R. Hyde, Kevin J. Burke, Ronald I. Keller, Cahill Gordon & Reindel, New York City, for Union Carbide Corp., Warren M. Anderson, John J. Creedon, Roberto DeJesus Toro, Harry J. Gray, James M. Hester, Jack B. Jackson, Horace C. Jones, Robert D. Kennedy, Ronald L. Kuehn, Jr., C. Peter McColough, William S. Sneath, J. Clayton Stephenson, Heinn F. Tomfohrde, III, Russell E. Train, Kathryn D. Wriston and Alec Flamm.

Bartlett H. McGuire, Jo Backer Laird, Jacqueline O. Stern, Douglas I. Brandon, Davis, Polk & Wardwell, New York City, for Morgan Stanley & Co.

Stuart L. Shapiro, Henry P. Wasserstein, Anne W. Crawford, David E. Bamberger, Skadden, Arps, Slate, Meagher & Flom, New York City, for First Boston Corp., First Boston, Inc. and First Boston Acquisition Holdings, Inc.

John S. Martin, Jr., Janet Neustaetter, Schulte Roth & Zabel, New York City, for Alfred E. Dudley and Alan C. Egler.

Jerome M. Congress, Milberg Weiss Bershad Specthrie & Lerach, New York City for Sy Richard Lippman and Ralph R. Scott.

Daniel W. Krasner, Wolf Haldenstein Adler Freeman & Herz, New York City, Richard D. Greenfield, Greenfield & Chimicles, Haverford, Pa., Larry A. Sucharow, Goodkind, Wechsler, Labaton & Rudoff, Harvey Greenfield, New York City, for

BRIEANT, Chief Judge.

By Memorandum and Order dated July 31, 1987, 666 F.Supp. 547, this Court set forth a detailed statement of the underlying facts alleged by plaintiffs in this case and taken as true for the purpose of resolution of the within motions. That decision discussed briefly the claims asserted against all of the defendants, and granted the motion of defendants Alfred E. Dudley and Alan C. Egler for summary judgment dismissing the complaint as to them. Familiarity of the reader therewith is assumed.

Defendant Union Carbide ("Carbide"), on behalf of the Corporation and the individually named directors and officers, has moved to dismiss pursuant to Rule 12(b)(6), F.R.Civ.P., for failure to state a claim, or in the alternative, for summary judgment pursuant to Rule 56, F.R.Civ.P. The First Boston defendants, First Boston Corp., First Boston, Inc., and First Brands Corp. ("First Boston"), moved separately to dismiss pursuant to Rule 12(b)(6), for failure to state a claim, and Rule 9(b), F.R.Civ.P., for failure to plead fraud with particularity; or, in the alternative, for summary judgment, pursuant to Rule 56, on the grounds set forth in the Union Carbide papers. Defendant Morgan Stanley moves to dismiss for failure to state a claim, Rule 12(b)(6), F.R.Civ.P.; or, in the alternative, for summary judgment, Rule 56, supplementing the submissions of defendant Union Carbide. These motions were fully submitted to this Court on September 1, 1987, with the filing of the most recent letter to the Court from defendant Union Carbide's counsel, which presented additional contentions and enclosed further deposition evidence.

For the reasons below, the motions of the First Boston defendants are granted and the motions of Morgan Stanley and Union Carbide are denied.

*First Boston*

The only federal securities claim asserted against defendant First Boston is contained in Count One, Complaint para. 50, which alleges a violation of Section 10(b) of the Securities Exchange Act of 1934 ("1934 Act"), in that:

"First Boston and the officer defendants knew or recklessly disregarded that deceptive statements were issued by Union Carbide in connection with the proposed sale of the Consumer Products businesses. Their participation in the sales of those properties notwithstanding such knowledge constitutes conspiracy in, and/or aiding and abetting of, the deceptive acts alleged in this cause of action ... First Boston gave substantial aid and assistance to Union Carbide and Home and Automotive management in the

perpetration of the aforementioned scheme through acts which included a pretense of participating in a competitive bidding process while secretly circumventing that process. By concealing the fact that the competitive bidding process had been tainted, First Boston and the individual First Boston defendants intended to and did encourage the other defendants to issue the false and misleading statements described above subsequent to January 4, 1986, and to refrain from issuing corrective public statements."

The only activities for which plaintiffs seek to impose liability against First Boston are: its participation in a bidding process for the Home and Automotive ("H & A") division of Union Carbide, and eventual acquisition of these assets, with knowledge that the bidding process had been tainted by virtue of certain meetings, discussed in our prior decision, between representatives of First Boston and Dudley and Egler, as to whom the Complaint has been dismissed by this Court; and their concealment in some unexplained way of the alleged fact that the bidding process was thus "tainted." No questions of material fact exist in connection with this claim against First Boston, and the Court assumes as it must that the allegations of the plaintiffs are true in this regard.

Apparently, First Boston is not charged with a primary violation of Section 10(b) of the 1934 Act (First Boston Mem. at 3–4; Plaintiff Mem. at 90).

Here the claim against First Boston is even more attenuated than the similar Rule 10b–5 claim previously dismissed by this Court against Dudley and Egler.

First Boston did not initiate contact with Union Carbide, but became involved when Daniel Raymond, District Production Manager of the H & A division, telephoned an old friend, Robert Henderson, to refer him to an investment banker "who he felt would be the best for us to work with in an acquisition effort" (Raymond Tr. 40); Henderson referred Raymond to Denis Newman, a good friend and then a managing director at First Boston (Newman Tr.

6); several meetings between these and other representatives of First Boston and H & A management thereafter eventuated (Plaintiff Mem. at 50–51). This defendant is further removed from a Section 10(b) violation in that none of its representatives or agents was an officer or director of defendant Union Carbide, and no evidence of First Boston's participation in the preparation and issuance of the relevant documents has been presented in the voluminous submissions to this Court.

To charge First Boston with liability for aiding and abetting a Rule 10b–5 violation, plaintiffs must demonstrate the three elements set forth in our prior decision (*see* Memorandum and Order dated July 31, 1987 at 561–65). Assuming, as the Court did therein, that the plaintiffs have supported adequately their claim of a primary federal securities law violation by Union Carbide, this Court concludes, for substantially the same reasons discussed with respect to Dudley and Egler, that plaintiffs have failed to demonstrate either the "knowledge" or "substantial assistance" elements as to First Boston.

In support thereof, plaintiffs state only in the most conclusory fashion that: "[t]he 'knowledge' element of aiding and abetting liability has plainly been satisfied" (Plaintiff Mem. at 93). Their ensuing contentions focus for the most part only on defendant Morgan Stanley in this regard (Plaintiff Mem. at 91–96). No knowledge evidence is presented as to First Boston, other than that derived from its allegedly "secret" meetings with Dudley and Egler which are said to have "tainted" the bidding process, and the financial benefits to be gained as a result of these meetings, and the nondisclosures allegedly contained in the documentation prepared and issued by Union Carbide. As this Court held earlier (Memorandum and Order at 33), the potential for financial gain does not, standing alone, indicate high conscious intent to aid and abet a securities law violation.

■ Liability cannot be imposed absent a showing at least that the defendant had actual knowledge of tortious conduct by the primary wrongdoer, particularly where the alleged aider and abetter owes no fiduciary duty to, and has no confidential relationship with, the injured party. The lower threshold of knowledge embodied in the recklessness standard is limited to those securities cases in which the alleged aider and abettor owes a fiduciary duty to the plaintiff. *See Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir.1983); *Rolf v. Blyth, Eastman Dillon & Co. Inc.*, 570 F.2d 38, 44 (2d Cir.), *cert. denied*, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978); *Terrydale Liquidating Trust v. Barness*, 611 F.Supp. 1006 (S.D.N.Y.1984). Where there is no duty of disclosure, an alleged aider-abettor to a securities fraud can be found liable only if scienter of the high "conscious intent" variety, "something closer to an actual intent to aid in the fraud", can be proved. *IIT v. Cornfeld*, 619 F.2d 909, 925 (2d Cir.1980).

■ There are no facts from which this Court could infer that this defendant had actual knowledge, or even the equivalent reckless disregard, of the allegedly misleading nature of the documents issued by Union Carbide, much less the high conscious intent required to be demonstrated in a situation such as this where, as with Dudley and Egler, there is no duty on the part of First Boston to act, and no participation of this bidder in the preparation or issuance of documents or the Rights by Union Carbide as the seller of the division.

Moreover, there is no evidence that First Boston representatives knew what type of arrangements, meetings, or negotiations, if any, were being conducted by Union Carbide with respect to the other bidders. Thus, even if First Boston were to be charged with knowledge of the content of the documents issued by Union Carbide to its shareholders in connection with the issuance of the Rights, it cannot be inferred from the facts as alleged by plaintiffs that this defendant knew, or recklessly disregarded, that the representations contained therein as to an ongoing "competitive bidding process" were allegedly false and misleading. Plaintiffs do not claim that the First Boston defendants knew who would win the bidding at any time prior to

the selection of their bid, or what the amount of the successful bid would be. Because there is no basis upon which to infer that First Boston knew what information if any pertaining to the H & A division had been disclosed to or found out by its prospective bidding competitors and in what manner, we cannot conclude that First Boston, simply because of the information it had itself acquired from Dudley or Egler, would be in a position to determine or know that the eventual sale of the business by Union Carbide would not be the result of "competitive bidding."

■ Plaintiffs have also failed to establish the requisite "substantial assistance" element as to defendant First Boston. As noted in *ITT v. Cornfeld*, 619 F.2d at 927, "inaction can create aiding and abetting liability only where there is a conscious or reckless violation of an independent duty to act."

It is undisputed that First Boston, as the bidder who was ultimately successful in purchasing the Home and Automotive business, owed no fiduciary duty to the shareholders of Union Carbide or the Rights holders who would eventually receive a pro rata share of the sale proceeds. Nowhere do plaintiffs demonstrate, or even suggest, the indicia of a relationship of trust and confidence between First Boston and the Rights holders. *See Osofsky v. J. Ray McDermott & Co., Inc.*, 725 F.2d 1057 (2d Cir.1984) (no fiduciary duty to target company's shareholders where outsider seeks to purchase the company's assets, in the absence of actual control and direction over the company's management or effective control through stock ownership); *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 14 (2d Cir.1983), *cert. denied sub nom. Moss v. Newman*, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984).

However, plaintiffs attempt to create a "duty to act" on the part of First Boston "by virtue of their possession of information—unavailable to the public—that the bidding process, although denominated 'competitive', was, as a result of their own activities, corrupted ... Additionally, [it is argued,] under principles applied in analo-gous cases involving insider trading, First Boston's wrongful receipt of confidential information from H & A management imposed upon First Boston a duty to disclose to the public that the bidding process was not, in fact, competitive" (Plaintiff Mem. at 100–101). This Court can find no merit in this attempt to impose such a novel and elusive duty upon potential purchasers of a business as a matter of federal law. Whether a state court could find such conduct actionable we need not consider. *Cf. Wechsler v. Bowman*, 285 N.Y. 284, 291, 34 N.E.2d 322 (1941).

The cases cited by plaintiffs are inapposite to the instant case, as this is not by any stretch of the imagination, even in our current climate of ever-expanding definition thereof, an insider trader situation. The disclose-or-abstain obligations upon which plaintiffs rely relate to the purchase and sale of corporate securities. No case has imposed comparable obligations on a potential bidder for assets in a corporate auction. *See, e.g., Dirks v. Securities and Exchange Comm'n*, 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983) (disclosure duty arises from the relationship between the parties and not merely from the ability to acquire information); *Walton v. Morgan Stanley & Co. Inc.*, 623 F.2d 796 (2d Cir. 1980) (investment banker representing acquiring company owes no duty to target solely on the basis of its acquisition of confidential information during negotiations); *Frigitemp Corp. v. Financial Dynamics Fund, Inc.*, 524 F.2d 275 (2d Cir. 1975) (no fiduciary duty to corporation by potential purchasers of corporate debenture; thus, not required to account to corporation for profits allegedly made as a result of inside information obtained during negotiations for purchase).

First Boston acquired the H & A assets through an arms length transaction with Union Carbide. This Court concludes that no duty, fiduciary or otherwise, existed between these parties. In fact, First Boston instead possessed an opposite duty running to its own shareholders, depicted by the court in *Terrydale Liquidating Trust v. Barness* under parallel facts as "a duty to

its own shareholders to aggressively pursue economically favorable transactions, rather than shield or warn [the] shareholders of the consequences of their own trustees' decisions." 611 F.Supp. at 1029. *See also Grumman Allied Industries, Inc. v. Rohr Industries, Inc.*, 748 F.2d 729, 739 (2d Cir.1984).

▇ A buyer has the right, and indeed the duty, to examine before or during the negotiation process the assets it seeks to purchase. That the buyer has outmaneuvered or outsmarted other potential bidders and in so doing furthered interpersonal contacts and obtained greater information, is not actionable as a federal securities fraud, absent strong evidence that these actions were precipitated by some preconceived fraudulent plan in connection with the purchase or sale of a security. A contrary holding would threaten to create a federal caselaw of corporate fiduciary duty, and wreak havoc on the business community, with no offsetting benefit. Therefore, we decline to impose on defendant First Boston the aider and abettor liability sought by the Rights holders by virtue of this bidder's vigorous efforts to obtain the maximum amount of information in pursuit of a profitable purchase, or its astute calculations based upon the information it was able to obtain through persistant contacts and meetings with representatives of Union Carbide, and its business acumen in acquiring the targeted business, presumably to the benefit of its own shareholders, directors and officers.

In addition, plaintiffs have failed to provide any evidence to support their allegations that First Boston was a participant in some conspiracy to violate Rule 10b–5. *See* Memorandum and Order at 564.

This Court need not address First Boston's Rule 9(b), F.R.Civ.P., objections at great length, but notes here that, primarily for the reasons discussed in its prior decision with respect to Dudley and Egler, this ground does not provide a basis for the requested relief (*see* Memorandum and Order at 557–559). While the Complaint makes sufficient allegations to withstand the motion to dismiss on Rule 9(b) grounds,

the plaintiffs do not demonstrate sufficient facts in support of its allegations concerning First Boston's secondary liability under § 10(b) of the 1934 Act. Upon the evidence presented, or lack thereof, First Boston is entitled to summary judgement on the merits.

This Court dismisses without prejudice the pendent state law claims alleged as to First Boston in Counts Four through Eight, as to which we can no longer exercise jurisdiction (*see* Memorandum and Order at 574).

Accordingly, the motion of First Boston for summary judgment is granted and all claims against that defendant are dismissed.

### Morgan Stanley

As this Court noted in its Memorandum and Order of July 31, 1987, the counts that remain against Morgan Stanley are Count One (primary and secondary violations of § 10(b) and Rule 10b–5 promulgated thereunder) and Counts Five through Eight (breach of fiduciary duty to the Rights holders, conspiracy, and aiding and abetting such breach; fraud and deceit; negligent misrepresentation; and intentional interference with contractual relations and business advantage). The Court now takes up these allegations in turn.

Plaintiffs allege that Morgan Stanley violated the federal securities laws in four ways: by participating in the issuance of materially misleading documents; by violating a continuing fiduciary duty to the Rights holders to issue a corrective disclosure; by recklessly disregarding the dissemination of materially misleading information; and by perpetrating a fraud on the market.

Plaintiffs' Complaint alleges that Morgan Stanley's projection of a range of net pretax sale proceeds of the Consumer Products businesses between $2 billion and $2.5 billion, reflected in at least four documents issued to the investing public by Union Carbide (the January 3, 1986 Supplement to Union Carbide's Offer to Purchase; the January 23, 1986 Form 8–K Report; the Union Carbide 1985 Annual Report, distrib-

uted in early March 1986; and the Union Carbide Form 10–K Report, distributed in late March-early April 1986), was materially misleading. Plaintiffs allege that Morgan Stanley had no reasonable basis for such an estimate; the necessary work for arriving at a reasonable estimate had not been done by January 3, and indeed at the January 2 board meeting Morgan Stanley's figures indicated a range of $2.041 billion–$2.141 billion.

Plaintiffs allege further that the January 3, 1986 Supplement was materially misleading in two ways. First, the table at page 7 of the Supplement setting forth the amount of the anticipated special dividend to be paid each Right holder used materially higher figures than Morgan Stanley had presented at the Board of Directors meeting the day before. Second, the Supplement materially understated the number of Rights Union Carbide expected to issue, because it did not take into account dilution from the forseeable exercise of employee stock options and the conversion of convertible debentures.

Plaintiffs claim that Morgan Stanley was aware of but recklessly disregarded the potentially misleading character of these statements: Morgan Stanley knew at the January 2 board meeting that the $2.5 billion figure had no reasonable basis, and assumed that dilution of Union Carbide common stock would occur. Moreover, although Morgan Stanley knew that the Union Carbide directors purported to rely on it for justification of the projections, and although it was apprised of the facts that confirmed that those projections had no reasonable basis, Morgan Stanley failed to issue any corrective statements.

Morgan Stanley, it is said, also approved of the "tainted" bidding process whereby First Brands succeeded in buying the H & A Division, according to plaintiffs, in that it knew of the contacts between First Boston and defendant Dudley, said to have given that bidder an edge, and in that its "fraudulently" high projections further tainted the bidding process by discouraging potential bidders who were not willing to bid in the high part of the $2 billion–$2.5 billion range.

Finally, Morgan Stanley allegedly caused the bidding process to be less than competitive by failing to inform bidders discouraged by Union Carbide's initial supply contract requirements, that Union Carbide had later decided to relax those requirements.

*Primary Violations of § 10(b) and Rule 10b–5*

Morgan Stanley responds to the Complaint by arguing that plaintiffs have not stated a claim against it for a primary violation of the federal securities laws, for three reasons: (1) the allegedly misleading statements were made by Union Carbide, not Morgan Stanley; (2) Morgan Stanley had no duty of disclosure with respect to these statements; (3) there is no indication that Morgan Stanley acted with scienter sufficient to support a 10b–5 claim (Morgan Stanley Mem. at 9–22).

Morgan Stanley observes that Rule 10b–5 makes it unlawful "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made ... not misleading." Rule 10b–5(2). It observes further that the statements plaintiffs allege to be misleading were all issued by Union Carbide, not by it, and that Rule 10b–5(2) is therefore inapplicable to it (Morgan Stanley Mem. at 9–11).

■ Although "'economic prognostication, though faulty, does not, without more, amount to fraud,'" *Decker v. Massey–Ferguson, Ltd.*, 681 F.2d 111, 117 (2d Cir. 1982), (quoting *Polin v. Conductron Corp.*, 552 F.2d 797, 805 (8th Cir.), *cert. denied*, 434 U.S. 857, 98 S.Ct. 178, 54 L.Ed. 2d 129 (1977)), "[l]iability may follow where management intentionally fosters a mistaken belief concerning a material fact, such as its evaluation of the company's progress and earnings prospects in the current year," *Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 164 (2d Cir.1980). A forecast can be actionable under the securities laws if it is "untrue," which courts have held it to be if the forecast is a representation of a company's "informed and reasonable belief" in its future performance that it "did

not then believe" or "knew that there was reason [not] to believe," *Marx v. Computer Sciences Corp.*, 507 F.2d 485, 490 (9th Cir. 1974), or is made without a "reasonable method of preparation and a valid basis," *id.; REA Express, Inc. v. Interway Corp.*, 410 F.Supp. 192, 197 (S.D.N.Y.) ("Absent a reasonable method of preparation or a valid basis, reckless and unfounded statements as to future earnings and future acquisitions ... are sufficiently misleading to be actionable under Rule 10b–5."), *rev'd on other grounds*, 538 F.2d 953 (2d Cir.1976).

This leaves for consideration the issue of whether Morgan Stanley, although it did not itself announce the projections, is nonetheless liable by reason of its part in having prepared them. Plaintiffs argue that Morgan Stanley "fully participat[ed]" in the alleged fraud and that "[a]s an integral and major participant in the fraud, Morgan Stanley is primarily liable under Section 10(b) regardless of whether projections were issued solely under Carbide's name, and whether the final decision to issue the projections was made by Carbide" (Plaintiff Mem. at 81–82). Plaintiffs rely, as support for this proposition, on *Sprayregen v. Livingston Oil Co.*, 295 F.Supp. 1376 (S.D.N.Y.1968). In that case, two directors of the defendant oil company had delivered a speech incorporating data provided by the accounting firm of Peat, Marwick that contained an overestimate of projected net profits and cash flow. The company's third director urged that the complaint be dismissed as to him because he was "charged with less than active participation." 295 F.Supp. at 1378. The court held that "a director who consents to and approves of the fraudulent practices of his fellow directors" is as liable as they under Rule 10b–5. *Id.* As Morgan Stanley contends, *Sprayregen* is inapposite. The quoted passage deals with the familiar question of the vicarious liability of a director for the fraudulent activities of his codirectors. The published opinion does not discuss Peat, Marwick's argument for dismissal; however, Morgan Stanley has provided this Court with a copy of Peat, Marwick's Memorandum of Law in *Sprayregen* (Affidavit of Bartlett H. McGuire,

Exh. A), which makes clear that Peat, Marwick argued for dismissal of the 10b–5 count solely on the ground that it was neither a purchaser nor a seller of Livingston Oil securities; Peat, Marwick did not argue that it was not a participant or substantial actor in the alleged fraud.

That *Sprayregen* is irrelevant to this case does not mean, however, that a firm of professional consultants is immune from 10b–5 liability for preparation of accounting data or financial information that contribute to misleading projections. As the Ninth Circuit has stated, "[a]n accountant may be liable for direct violation of the rule [10b–5] if its participation in the misrepresentation is direct and if it knows or is reckless in not knowing that the facts reported in the prospectus materially misrepresent the condition of the issuer." *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1312 (9th Cir.1982), *cert. denied sub nom. Smith v. Harmsen*, 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983). Plaintiffs allege that "Morgan Stanley knew or recklessly disregarded that the public statements being issued by Union Carbide were materially misleading," Complaint para. 49, and offers evidence from which a jury could conclude that Morgan Stanley directly prepared the allegedly misleading projections, *see* Plaintiff Mem. at 81 (quoting depositions regarding Morgan Stanley involvement in determining anticipated sale proceeds range).

As Morgan Stanley recognizes, its contention that Union Carbide rather than it made the allegedly misleading statements can at most shield it from primary liability under Rule 10b–5(2), not 10b–5(1) or (3). Under a theory of fraud on the market such as our Court of Appeals recognized in *Panzirer v. Wolf*, 663 F.2d 365 (2d Cir. 1981), Morgan Stanley's alleged role in knowingly or recklessly preparing the projections could constitute the employment of a "device, scheme, or artifice to defraud" in violation of 10b–5(1) or an "act, practice, or course of business which operates or would operate as a fraud or deceit upon any person" in violation of 10b–5(3). This Court notes that in her careful analysis of the

fraud on the market theory in *Lipton v. Documation, Inc.,* 734 F.2d 740 (11th Cir. 1984), *cert. denied sub nom. Peat, Marwick, Mitchell & Co. v. Lipton,* 469 U.S. 1132, 105 S.Ct. 814, 83 L.Ed.2d 807 (1985), Judge Kravitch maintained that "the fraud on the market theory finds its greatest justification when applied to class actions alleging fraudulent misrepresentations or omissions that affected security prices on a developed open market," *id.* at 745; application of the theory is more questionable in situations involving "new issues in an undeveloped market," *id.* at 746. Although the Rights were new issues, this Court finds that Judge Kravitch's rationale for applying the theory in the context of a developed market, that "it is reasonable to assume that misinformation disseminated into the marketplace will affect the market price," *id.* at 745, applies here, because it was this alleged misinformation about the expected pretax sale proceeds and the number of Rights to be issued that inflated the market price of the Rights.

Morgan Stanley argues that because it did not itself make any allegedly misleading public statements, it can be subject to primary 10b–5 liability only if it breached some independent duty to disclose, and further argues that it had no such duty.

Morgan Stanley relies for this proposition principally upon *Gold v. DCL, Inc.,* 399 F.Supp. 1123 (S.D.N.Y.1973). In that case, the complaint was dismissed as to the defendant accounting firm Price Waterhouse, because it was held not to have a duty to disclose that it was aware that information attributed to it was misleading. Morgan Stanley's position, then, is that *only* when an accounting firm certifies a financial statement does it impose upon itself a duty to disclose material misrepresentations to the public. *Gold* is frequently cited for the proposition that mere nondisclosure does not create Rule 10b–5 liability, often in connection with the makeweight, self-fulfilling rationale that the contrary view would expose independent professionals to limitless "vistas of liability [that] would lead to serious mischief." *Wessel v. Buhler,* 437 F.2d 279, 283 (9th Cir.1971). *See, e.g., In re AM International, Inc. Securities Litigation,* 606 F.Supp. 600, 606 (S.D.N.Y.1985); *Sharp v. Coopers & Lybrand,* 457 F.Supp. 879, 891 (E.D.Pa.1978), *aff'd,* 649 F.2d 175 (3rd Cir.1981), *cert. denied,* 455 U.S. 938, 102 S.Ct. 1437, 71 L.Ed.2d 648 (1982).

However, this Court finds citation of *Gold* in the present context unpersuasive. Plaintiffs here claim that Morgan Stanley acted affirmatively to implement an alleged fraudulent scheme, among other things, by providing an inflated range of potential net pretax sale proceeds. *Gold* does not stand for the proposition that an independent consulting firm can escape 10b–5 liability for providing misleading figures simply on the ground that those figures were intended for internal corporate consumption only, or that the actual misrepresentations to the public were made by the corporation rather than the consulting firm. *Gold*'s language implies, indeed, that such active assistance is actionable under 10b–5, and subsequent cases that cite *Gold* do not involve firms that provided corporations with misleading forecasts or the raw data therefor. For example, in *AM International,* Price Waterhouse acted as the company's outside auditor only. Similarly, when the court in *Mendelsohn v. Capital Underwriters, Inc.,* 490 F.Supp. 1069, 1084 (N.D.Cal.1979) found that an accounting firm was not liable for aiding and abetting the principal even though it provided the principal with accounting services, the rationale was that the services did not assist the fraud: "Plaintiffs have not shown that setting up books to faithfully record DiGirolamo's dubious transactions in any way facilitated the alleged fraud or encouraged its perpetrators. To the contrary, [the accountant's] work only made exposure more likely."

■ Thus, this Court rejects Morgan Stanley's invitation to hold that an independent professional firm is subject to primary 10b–5 liability only if it has certified or made other public representations about a corporation's allegedly misleading statements. Preparation of misleading projections or provision of the raw data for such projections can constitute direct partic-

ipation in a misrepresentation, and lead to primary 10b–5 liability as was held in *Seaboard.*

■ It is an issue of fact, which cannot be resolved on motion, whether Morgan Stanley's involvement in preparing the projections at issue here rises to that level. As well, it is of course a question of fact whether the projections actually were materially misleading.

Although this Court detects a hint of circularity in plaintiffs' argument that the bidding process was tainted because potential bidders were discouraged by the misleading high end of the $2 billion–$2.5 billion bidding range, and that the projections were misleading because there were no bids in the upper range, the standard for materiality is inherently factual. "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important" in making an investment decision. "Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976) (announcing materiality standard for Rule 14a–9, applied by our Court of Appeals to Rule 10b–5 in *Goldberg v. Meridor,* 567 F.2d 209, 218–19 (2d Cir.1977), *cert. denied,* 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978)). Only if the allegedly material facts are "so obviously important to an investor, that reasonable minds cannot differ on the question of materiality" is that question appropriate for summary judgment. *Northway,* 426 U.S. at 450, 96 S.Ct. at 2133, *quoting Johns Hopkins University v. Hutton,* 422 F.2d 1124, 1129 (4th Cir.1970).

■ The situation is somewhat different when we turn to the question whether Morgan Stanley is primarily liable for the use by Union Carbide of outstanding share figures, without adjustment for estimate dilution, in calculating estimated proceeds for the Rights holders. In this instance, Morgan Stanley claims that the decision to use such figures was made by Union Carbide on the advice of its outside attorneys (not counsel of record in this litigation). But see the August 4, 1987 deposition testimony of Janet Thiele, Esq. to the effect that "Morgan Stanley participated in the decision to publish the chart." Letter of Jerome M. Congress, Esq., August 11, 1987, at 2. Here too, issues of fact abound. Because a company is not *required* to offer projections, *Billard v. Rockwell International Corp.,* 526 F.Supp. 218, 221 (S.D.N.Y.1981), *aff'd,* 683 F.2d 51 (2d Cir.1982); *Straus v. Holiday Inns, Inc.,* 460 F.Supp. 729, 734 (S.D.N.Y.1978), such projections as it does offer need provide "nothing more than the disclosure of basic facts so that outsiders may draw upon their own evaluative expertise in reaching their own investment decisions with knowledge equal to that of the insiders," *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 849 (2d Cir. 1968), *cert. denied,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). Indeed, "[o]rdinarily ... the courts discourage presentations of future earnings, appraised asset valuations and other hypothetical data," *Kohn v. American Metal Climax, Inc.,* 458 F.2d 255, 265 (3d Cir.), *cert. denied,* 409 U.S. 874, 93 S.Ct. 120, 34 L.Ed.2d 126 (1972). Whether the table of projected Rights proceeds disclosed such basic facts is an issue of fact. If the table failed to make such disclosure, it will then be another issue of fact whether Morgan Stanley acted with scienter in using figures based on dilution, at the January 2 board meeting, but acquiescing in the use of undiluted figures in the January 3 Supplement. If, as Morgan Stanley argues (Morgan Stanley Mem. at 18–19; Morgan Stanley Reply Mem. at 29), its actions were neither intentional nor reckless, it is shielded from primary 10b–5 liability.

In *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), the Supreme Court held that no claim was stated against an outside accounting firm when there was no allegation of scienter: that is, mere negligence does not suffice for 10b–5 liability. *Ernst & Ernst* did not define the minimum element

of scienter necessary to a § 10(b) claim; whether recklessness is sufficient, or whether some degree of intent is required, and if so what degree. For primary § 10(b) violations, our Court of Appeals has held that an allegation of recklessness is sufficient. *E.g., Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 575 (2d Cir.1982), *cert. denied*, 459 U.S. 838, 103 S.Ct. 86, 74 L.Ed.2d 80 (1982); *IIT, an International Investment Trust v. Cornfeld*, 619 F.2d 909, 923 (2d Cir.1980); *Lanza v. Drexel & Co.*, 479 F.2d 1277, 1305 (2d Cir.1973) (en banc). *See Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 545 F.Supp. 1314, 1356 (S.D.N.Y.1982). It has characterized recklessness as "at the least, conduct which is 'highly unreasonable' and which represents 'an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir.), *cert. denied*, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978), *quoting Sanders v. John Nuveen & Co.*, 554 F.2d 790, 793 (7th Cir.1977).

This Court, without commenting on the strength of the evidence plaintiffs offer to support their allegations, holds that they have alleged and shown, at this stage, sufficient evidence of scienter and materiality to require trial of a claim for primary § 10(b) liability as to Morgan Stanley. *Cf. In re Energy Systems Equipment Leasing Securities Litigation*, 642 F.Supp. 718, 743 (E.D.N.Y.1986) (noting that defendants could not appropriately proceed on motion to dismiss by disputing truth of plaintiffs' claims of scienter, actionable misrepresentation, and independent duty of disclosure).

*Secondary Liability*

The question next arises whether Morgan Stanley's alleged activities subject it to liability for aiding and abetting a 10b–5 violation. The same three elements of secondary liability—a primary violation, knowledge of that violation by the secondary violator, and substantial assistance—apply here as elsewhere. "An accountant may be liable as an aider and abettor if it

knows, or is reckless in not knowing, that its client has committed a primary violation, and it substantially aids the client in the overall enterprise." *Seaboard*, 677 F.2d at 1312. Plaintiffs contend that Morgan Stanley is secondarily liable for the two failures to disclose that allegedly tainted the bidding process: its failure to inform potential bidders that Union Carbide had relaxed its supply contract requirements, and its failure to reveal to the Rights holders that the bidding process was not truly competitive. Assuming without deciding, as with all the secondary defendants, for the purposes of this analysis that plaintiffs have supported adequately their claim of a primary securities law violation by Union Carbide, this Court considers the questions of scienter and substantial assistance.

Our Court of Appeals has distinguished fiduciaries from nonfiduciaries with respect to the scienter required as an element of a § 10(b) aiding and abetting violation. It has consistently held that recklessness is sufficient scienter "where 'the alleged aider and abettor owes a fiduciary duty to the defrauded party,'" *Sirota*, 673 F.2d at 575, *quoting Rolf*, 570 F.2d at 44. It has still, however, "not decided whether recklessness is sufficient in the absence of such a relationship," *Sirota*, 673 F.2d at 575, although the *Sirota* court quoted with approval the distinction set out in *Woodward v. Metro Bank*, 522 F.2d 84, 97 (5th Cir. 1975), *cert. denied sub nom. Wood Walker & Co. v. Marbury Management, Inc.*, 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980): "When it is impossible to find any duty of disclosure, an alleged aider-abettor should be found liable only if scienter of the 'high conscious intent' variety can be proved. When some special duty of disclosure exists, then liability should be possible with a lesser degree of scienter."

The fraud on the market theory simply constitutes a presumption of reliance by purchasers and sellers on the acts or omissions of alleged securities law violators through reliance on the integrity of the market. Our Court of Appeals has suggested in dictum that recklessness is sufficient when an accountant can foresee that

third parties will rely on its information. *Oleck v. Fischer*, 623 F.2d 791, 794 (2d Cir.1980). It follows that recklessness is sufficient in fraud on the market cases. We see no rational distinction in this factual context between the participation of investment bankers and that of accountants, in a claimed securities fraud.

Thus, the Court holds that plaintiffs have alleged a sufficient degree of scienter to state a claim against Morgan Stanley for § 10(b) aiding and abetting liability, as well as a primary violation.

In alleging the third element of aiding and abetting liability under § 10(b), the provision of substantial assistance to the primary violator, the complaint "must allege that the acts of the aider and abettor proximately caused the harm to the corporation on which the primary liability is predicated.... Allegations of a 'but for' causal relationship are insufficient." *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 62 (2d Cir.1985). Whether Morgan Stanley's activities proximately caused the harms alleged by plaintiffs is of course essentially a question of fact. The only question of law is whether the fact that some of Morgan Stanley's alleged secondary violations consist of *inaction* raises any special problem. This Court concludes that in the context of this case, it does not. In *Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir.1983), our Court of Appeals observed that "[i]naction on the part of the alleged aider and abettor ordinarily should not be treated as substantial assistance, except when it was designed intentionally to aid the primary fraud or it was in conscious or reckless violation of a duty to act." Because, as has just been observed, accountants who can reasonably foresee that the information they provide will be relied on by third parties have a duty, grounded in the integrity of the market, to provide accurate information, a conscious or reckless failure to provide such information satisfies the *McAlpin* standard.

We therefore deny Morgan Stanley's motion for summary judgment on the federal securities claims.

### State Law Claims

Having sustained plaintiffs' federal claims against Morgan Stanley, this Court has pendent jurisdiction over the state law claims alleged against the defendant, and now turns to assess the sufficiency of those claims.

Count Five of the Complaint alleges that, as a matter of state law, "Morgan Stanley had fiduciary duties to the Rights holders in light of their activities as agent for and advisor to the Union Carbide Board in connection with the Rights and the sale of the Consumer Products businesses" (Complaint para. 73) and that "Morgan Stanley [has] conspired in and/or aided and abetted [Union Carbide's] breaches of fiduciary duty through [its] participation (*id.* para. 75). Morgan Stanley correctly notes that plaintiffs do not allege a primary violation of Morgan Stanley's state law fiduciary duties, but only a secondary violation in connection with Union Carbide's primary violation (Morgan Stanley Mem. at 43).

The elements of such a secondary violation were set forth in *Whitney v. Citibank, N.A.*, 782 F.2d 1106, 1115 (2d Cir.1986) as follows: "The claimant must prove (1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that the plaintiff suffered damages as a result of the breach." Assuming for purposes of this analysis only, that plaintiffs have successfully alleged a primary violation on the part of Union Carbide, satisfying the first element, plaintiffs have alleged facts from which a jury could conclude that Morgan Stanley knew of and participated in such violation; for example, plaintiffs allege that Morgan Stanley knew of the "taint" placed on the bidding process by the contacts with First Boston, and that Morgan Stanley itself contributed to that so-called taint by providing data that inflated the market or selling price of the Rights. Moreover, plaintiffs have alleged facts from which a jury could conclude that they were damaged; for example, that the Rights holders purchased or received their rights at an inflated price that would not

have been set but for the tainted bidding process. The Court thus concludes that if a primary violation has indeed been alleged against Union Carbide, Count Five should stand as against Morgan Stanley.

Count Six charges Morgan Stanley, among other defendants, of whom only Union Carbide remains in this suit, with common law fraud and deceit. The elements necessary for such a claim are the making of a false statement with scienter, in the intent that plaintiff rely on the false statement, justifiable reliance by plaintiff on the false statement, and pecuniary damages. *Aeronca, Inc. v. Gorin*, 561 F.Supp. 370, 373 (S.D.N.Y.1983). Morgan Stanley argues that three of these elements are lacking: the false statement, justifiable reliance by the plaintiff, and directly caused pecuniary loss. Defendant further contends that, insofar as the count is based on a failure to disclose, New York law requires a fiduciary relationship between the parties.

■ First, Morgan Stanley claims that under New York common law, representations as to future value are generally considered to be expressions of opinion and not sufficient grounds for a claim of fraud. *Yoss v. Sacks*, 26 A.D.2d 671, 672, 272 N.Y.S.2d 387, 389 (2d Dep't 1966). This proposition is generally correct, but does not apply when "the vendor knew [the representations] to be untrue, intended to mislead, and factors existed whereby the purchaser relying on such representations could not or would not make inquiries he otherwise would have made." *Nash v. Gay Apparel Corp.*, 27 Misc.2d 903, 213 N.Y.S.2d 94, 95 (Sup.Ct.), *aff'd*, 13 A.D.2d 942, 218 N.Y.S.2d 574 (1961). Such reliance may occur when there is a relationship of trust and confidence between the parties that "need not be a formal fiduciary one; it is sufficient that one can reasonably be expected to confide in the other." *Id.* Here, plaintiffs have offered evidence to show, among other things, that Morgan Stanley used diluted figures at the January 2 board meeting and undiluted figures in the January 3 Supplement, an allegation from which a jury could conclude that Mor-

gan Stanley knowingly intended to assist Union Carbide to mislead readers of the Supplement. Moreover, a jury could conclude that readers of the Supplement would reasonably rely on Morgan Stanley's expertise and superior knowledge, and forego their own inquiries.

Second, Morgan Stanley argues that "[e]ven at common law, if the plaintiff has been furnished with the means of knowledge and he is not prevented from using them he cannot say that he has been deceived by the misrepresentations of the other party" (Morgan Stanley Mem. at 47, *quoting Frigitemp Corp. v. Financial Dynamics Fund, Inc.*, 524 F.2d 275, 282 (2d Cir.1975)). As noted above, it is a question of fact to what degree, if any, presentation of the allegedly misleading figures induced plaintiffs, in their reasonable reliance on defendants' superior knowledge, to refrain from undertaking their own analysis of the Rights proposal. There is also an issue of fact regarding the extent to which the information that would have enabled plaintiffs to undertake such an analysis had been furnished to them. Morgan Stanley quotes from the deposition of one of plaintiffs' purported class representatives to show how little effort had been made to investigate the financial status of Union Carbide (Morgan Stanley Mem. at 47–48). These excerpts may suggest that this individual was slothful, but this does not demonstrate that all necessary information was available to the most diligent member of the proposed class, i.e., that full disclosure had been made.

Third, Morgan Stanley maintains that plaintiffs must prove their damages were proximately caused by this defendant's conduct. *See Idrees v. American University of the Caribbean*, 546 F.Supp. 1342, 1350 (S.D.N.Y.1982). This is, of course, an issue of fact.

For the foregoing reasons, this Court holds that plaintiffs have sufficiently supported a claim against Morgan Stanley for common law fraud so as to survive a motion for summary judgement.

In Count Seven, plaintiffs charge Morgan Stanley, among other defendants, with

negligent misrepresentation. Morgan Stanley argues only that plaintiffs fail to state a claim "[f]or the reasons set forth in Union Carbide's brief" (Morgan Stanley Mem. at 50), and this Court refers the reader to its conclusion as to Union Carbide, below, that this factual determination be submitted to a jury.

■ Finally, Count Eight accuses Morgan Stanley, among other defendants now dismissed, with intentional interference with contractual relations and business advantage. The plaintiffs and Morgan Stanley agree that such a claim requires (1) the existence of a valid contract between plaintiff and a third party; (2) the defendant's intentional procurement of a breach of that contract; and (3) damages. *Israel v. Wood Dolson Co.*, 1 N.Y.2d 116, 120, 151 N.Y. S.2d 1, 5, 134 N.E.2d 97, 99 (1956). They differ, however, on the question whether there was a contract between Union Carbide and the Rights holders, Morgan Stanley maintaining that the only contract involved is the Rights Agreement between Union Carbide and Manufacturers Hanover (Morgan Stanley Mem. at 52). As held in connection with Union Carbide, *infra*, this determination hinges upon resolution of factual issues by the jury.

*Union Carbide*

First, we note that there is no contention in the present action that the response of Carbide's management to the GAF offer by, among other things, creation of the Rights, was itself improper or a breach of fiduciary duty to the shareholders. As held by Judge Pollack of this Court in an earlier action in which GAF as the hostile tender offeror sought to enjoin the Carbide Board's creation of these rights and certain other measures, *GAF Corp. v. Union Carbide Corp.*, 624 F.Supp. 1016, 1019 (S.D.N.Y.1985): "[t]he action of the Board to foster the future intact existence of Carbide, except for such sales of assets as would reasonably be needed to prune aspects of the Company and leave it substantially alive as it presently is, represents a reasonable view on the part of the Board of what is best for shareholders." This Court fur-

ther concluded that: "[d]eterring an unfair offer is entirely legitimate. GAF is not entitled to have the terms of an exchange offer dictated by GAF, free of competition." *Id.* at 1020. Accordingly, Carbide's motivation and ingenuity in its decision to issue the Rights are not at issue in this lawsuit, but rather its factual representations made or omitted in the documentation issued in connection with the Rights.

Plaintiffs claim that Union Carbide and its directors made materially misleading representations to the purported class members and the investing public concerning the Rights in publishing a range of $2 to 2.5 billion as estimated pre-tax sale proceeds, an amount which allegedly was known by Carbide (and Morgan Stanley) to be unrealistic and false. Union Carbide failed to disclose that these businesses would be sold on restrictive terms which included a covenant for the continued employment of certain Union Carbide executives and employees, and a required exclusive long term supply contract with Union Carbide, claimed by plaintiffs to be material omissions. These restrictions, together with the meetings between Carbide management and First Boston representatives, plaintiffs claim, decreased the sales value of the businesses and thereby breached Carbide's self-imposed promise or its "duty" to maintain competitive bidding and to obtain the maximum sales proceeds for the Rights holders.

Further, plaintiffs argue that these Rights should have been registered under the Securities Act of 1933 and thus Union Carbide engaged in the unlawful sale of unregistered securities.

Plaintiffs also contest certain deductions from the sale proceeds made by Union Carbide as "liabilities and expenses", and contest the failure to pay Rights holders any interest on this sum for the time period after sale and before distribution.

*Section 12 of the Securities Exchange Act of 1933*

Counts Two and Three charge defendant

Union Carbide [1] with violations of Sections 5, 12(1) and 12(2) of the Securities Exchange Act of 1933, 15 U.S.C. §§ 77e, 77*l* (1), 77*l* (2) ("1933 Act"), by their failure to register the Rights thereunder.

Defendant Union Carbide urges that the Rights represent a "special distribution" exempt from registration under the 1933 Act on the grounds that they were not sold "for value." This argument applies, of course, only to the shareholders, who as is undisputed, paid no cash consideration to Carbide upon the initial issuance of the Rights. Section 2(3) of the 1933 Act, 15 U.S.C. § 77b(3) (1982), defines "sale" to include "every contract of sale or disposition of a security or interest in a security, *for value*" (emphasis added).

Plaintiffs allege that the "value" that Union Carbide's shareholders gave up in exchange for the Rights (1) "included the inducement of Union Carbide shareholders to take steps which discouraged GAF from continuing with its takeover effort, and [ (2) ] which included the forced sale by the shareholders of the value of a potential takeover premium inherent in Union Carbide shares" (Complaint para. 56). In their opposition brief, plaintiffs formulate additional theories of "value", namely that: Carbide and its officers and agents received value through the defeat of the GAF tender offer, the perpetuation of Carbide's independent existence, the retention of lucrative positions and the obtaining of exclusive supply contracts (Plaintiff Mem. at 107).

Defendants respond that neither Union Carbide nor its director and officers received any financial benefit from the creation of a market for the Rights (Union Carbide Reply at 75; Fusaro Tr. at 277–78).

The resolution of this issue essentially turns on a characterization of the Rights, and the transaction of which they are a part, as either a "special distribution" or as a "spin-off" transaction. While this inquiry is not squarely addressed by the parties, the only supporting authorities cited for plaintiffs' broad interpretation of the "value" requirement are two cases in which a spin-off of the corporation's assets into a new subsidiary—a corporate reorganization—occurred. *See Securities and Exchange Comm'n v. Harwyn Industries Corp.*, 326 F.Supp. 943 (S.D.N.Y.1971); *Securities and Exchange Comm'n v. Datronics Engineers, Inc.*, 490 F.2d 250 (4th Cir.1973), *cert. denied*, 416 U.S. 937, 94 S.Ct. 1936, 40 L.Ed.2d 287 (1974). In both of these cases, the courts found a stock issuance to be a "sale" within the meaning of Section 5 by viewing the distribution of shares as part of an overall transaction in which the defendant corporations either owned or purchased privately held companies and then issued the stock in the subsidiary to shareholders of the parent corporation, thereby taking privately held companies public without registration or making any substantial disclosure. As the court explained in *Harwyn:*

> "Here the so-called 'dividends' were not isolated transactions; they were intimately bound up with and in the last three instances mandated by the agreements which required the outside defendants to infuse new value into the subsidiaries and which contemplated that upon distribution of the 'dividend' shares to existing Harwyn stockholders public trading would occur as the result of some selling their shares to new purchasers. In such a context the chain of events must be viewed as a whole, just as it was viewed by the parties when they undertook the spin-off ventures.... When the agreement, spin-off and distribution is viewed as one transaction, there was 'value' received by Harwyn and the inside defendants in the form of a contribution of substantially new assets to each subsidiary and the creation of a public market in the shares with its resulting benefits to the defendants, including insiders."

*Id.* at 954.

---

**1.** Counts Two and Three originally included allegations against defendants Morgan Stanley, and Dudley and Egler, but plaintiffs have withdrawn these claims except as against defendants Union Carbide and its directors (Plaintiff Mem. at 111, n. *).

The only other case cited by plaintiffs in support of this proposition, *United States v. Rubinson,* 543 F.2d 951, 958 n. 18 (2d Cir.), *cert. denied,* 429 U.S. 850, 97 S.Ct. 139, 50 L.Ed.2d 124 (1976), is wholly inapposite to the issue herein, as that case solely involved the question of whether stockholders who receive unregistered spin-off stock legally may sell it to the public.

The holding of *Harwyn* and its progeny has been specifically limited to spin-off transactions by the Court of Appeals for the Second Circuit in *International Controls Corp. v. Vesco,* 490 F.2d 1334, 1344 (2d Cir.), *cert. denied,* 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 236 (1974): "[i]n each instance, the court held that the parent corporation had received 'value' or consideration for the 'disposition' of its subsidiary through the creation of a public market in the subsidiary's shares, an 'aftermarket' which substantially increased the value of the spun-off subsidiary's shares retained by the parent corporation or by the insiders in control of the parent." Although *Vesco* did as plaintiffs contend involve § 10(b), this Court considers it relevant insofar as it reflects our Circuit's treatment of *Harwyn* as limited to its particular facts, a characterization with which this Court concurs. There has been no other case demonstrating acceptance of such a broad view of "value" under the 1933 Act.

■ Clearly, the instant Rights distribution did not involve a spin-off transaction. The Rights entitled the holder to a pro rata share of the proceeds of a sale of company assets to an independent third party, and did not evoke an ongoing shareholder relationship with this purchasing corporate vehicle or any entity. *See generally Commissioner of Internal Revenue v. Baan,* 382 F.2d 485, 491 (9th Cir.1967), *aff'd* 391 U.S. 83, 88 S.Ct. 1517, 20 L.Ed.2d 448 (1968) ("spin-off" occurs where part of assets of corporation is transferred to a new corporation and stock of transferee is distributed to shareholders of transferor without surrender by them of stock in transfer); *Holz v. United States,* 176 F.Supp. 330, 336 (D.Minn.1959) ("spin-off" exists when a parent corporation organizes

a subsidiary, to which is transferred part of parent's assets in exchange for all of capital stock of subsidiary and stock of subsidiary is transferred to parent's shareholders without surrender of their stock in parent). Moreover, the one time issuance of a Right to receive a special distribution, that would only trade for a matter of months is readily distinguishable from the repeated underwriting of shares in companies about which the investing public had no information.

However, the issue of whether the issuance of the Rights involved "value" furnished by the recipients is, in the context of this case, a difficult and complex mixed issue of law and fact, which, as a matter of discretion, the Court believes should not be resolved on less than a plenary trial record. Indeed, we observe tentatively that as a matter of statutory construction the term "value" used in the 1933 Act need not be consistent in all respects with the terms "purchase or sale" when used in the context of Rule 10b–5. See discussion *infra.* Whether Union Carbide's further contention that, in its disclosures to its shareholders and to the public under the 1934 Act, ample information was readily available to the investment community is valid seems also to present an issue of fact. (*see* Union Carbide Reply at 76–77; *contra* Plaintiff Mem. 108–110).

■ This branch of Union Carbide's motion is denied at this time with leave to renew at trial when plaintiffs rest. This Court agrees, however, that Union Carbide cannot be held liable to the open market purchasers of the Rights under Sections 5, 12(1) and 12(2) of the 1933 Act. Sections 12(1) and (2) were designed as a vehicle for a purchaser to claim against his immediate seller, and as such require privity. No such relationship with the immediate sellers of the Rights, or participation in these secondary sales, has been herein demonstrated, or even alleged by the plaintiffs.

Nor is this a case falling within the exception formulated by *Katz v. Amos Treat Co.,* 411 F.2d 1046 (2d Cir.1969), which embraced a more expansive view of immediate seller or "controlling" the previous owner to include "every attempt or offer to

dispose of, or solicitation of an offer to buy, a security or interest in a security, for value." *Id.* at 1052–53. Here, there is a dearth of evidence, and not even the hint of an allegation, that Union Carbide or its directors solicited for, or participated in any way in, the secondary sales of the Rights in the open market.

We note in passing that civil liability in connection with the sale or offering of a security to a purchaser by means of a prospectus or oral communication which contains materially misleading statements or omissions, contemplates a tender of the subject security by that purchaser. Only upon such rescission or sale of the security can the purchaser seek relief in the nature of monetary damages for "the consideration paid for such security with interest thereon, less the amount of any income received thereon...." § 12(2), 15 U.S.C. § 77*l*(2). *See Demarco v. Edens*, 390 F.2d at 839; *Billet v. Storage Technology Corp.*, 72 F.R.D. 583, 586–87 (S.D.N.Y. 1976); *Pfeffer v. Cressaty*, 223 F.Supp. 756, 757 (S.D.N.Y.1963). Accordingly, the compensatory damages sought by this Complaint are not the proper remedy for the alleged violation of Sections 12(1) and (2).

*Section 10(b) of the Securities Exchange Act of 1934*

Union Carbide contends that the claims against it under Section 10(b) of the 1934 Act and Rule 10b–5 promulgated thereunder, as asserted by the plaintiffs who did not purchase the Rights on the open market but received them from Union Carbide in their capacity as shareholders, cannot stand, because the "purchaser" or "seller" requirement has not been met.

Only a purchaser or seller of securities has a claim actionable under Section 10(b) or Rule 10b–5. *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir.), *cert. denied*, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952). In *Shaw v. Dreyfus*, 172 F.2d 140 (2d Cir.), *cert. denied*, 337 U.S. 907, 69 S.Ct. 1048, 93 L.Ed. 1719 (1949), our Court of Appeals determined that a stockholder's receipt of either

a stock dividend or warrants was not a purchase under the 1934 Act, because "purchase" for the purposes of the 1934 Act means "to acquire something by one's own act or agreement for a price." *Id.* at 142. Here, it is contended, Carbide shareholders did not pay any cash consideration or take any action, and could not have taken any action, to cause or prevent the issuance of the Rights to them (Union Carbide Mem. at 71–72).

■ An exception to this classic purchase and sale transaction has been recognized in the case of a "forced seller" situation, when the transaction effected "such significant change in the nature of the investment or in the investment risks as to amount to a new investment." *Abrahamson v. Fleschner*, 568 F.2d 862, 868 (2d Cir.1977), *cert. denied*, 436 U.S. 905, 98 S.Ct. 2236, 56 L.Ed.2d 45 (1978); *Sacks v. Reynolds Securities, Inc.*, 593 F.2d 1234, 1240 (D.C.Cir.1978). The courts have granted "forced seller" status in situations such as in *Vine v. Beneficial Finance Co.*, 374 F.2d 627 (2d Cir.), *cert. denied*, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967), where a shareholder was faced with the choice of either retaining stock in a corporation that had ceased to exist or exchanging his shares for value as part of a short form merger, and the securities would have become worthless unless exchanged; or where there there has been a complete liquidation of a corporation, *see, e.g., Silverman v. Senft*, [1985–1986 Transfer Binder] CCH Fed.Sec.L.Rep. para. 92,-543, at 93,240 (S.D.N.Y.1986) [Available on WESTLAW, 1986 WL 3772]; *Alpex Computer Corp. v. Pitney–Bowes, Inc.*, 417 F.Supp. 328, 332 (S.D.N.Y.1976). This exception has been narrowly construed. In *Alpex Computer Corp.*, for example, the court reasoned that:

"If no line was drawn between 'winddowns' and liquidations, conceivably a shareholder could sue under 10b–5 upon a radical change in the nature or complexion of the company's business, or to redress a management decision to sell off a certain part of the firm's business,

despite the fact that no purchase or sale of stock was involved."

417 F.Supp. at 332.

*See also Rathborne v. Rathborne,* 683 F.2d 914, 920 (5th Cir.1982) (after pro rata distribution of stock in wholly owned subsidiary, plaintiff continued to hold stock representing same proportionate interest in same enterprises); *Sargent v. Genesco, Inc.,* 492 F.2d 750, 764–65 (5th Cir.1974) (dilution of equity through issuance of new shares but still had an interest in going concern); *Canadian Javelin Ltd. v. Brooks,* 462 F.Supp. 190, 196 (S.D.N.Y.1978) (reduction of proportional ownership interest in corporation did not constitute forced sale).

■ Plaintiffs characterize the supposed "significant change" which Carbide "imposed upon" the persons receiving the Rights as two-fold: a "forced exchange" of a portion of the value of the Carbide shares for the Rights, "a very different investment vehicle from Carbide common stock"; and a significant change in the nature of the assets which underlay the securities involved (Plaintiff Mem. 102; Complaint para. 53). Plaintiffs note that upon issuance of the Rights, the market price of Carbide's common stock immediately dropped by one-third. Plaintiffs take this phenomenon as a demonstration that "in economic substance, Carbide forced its shareholders to give up one-third of their holdings of common stock in return for the Rights".[2] (Plaintiff Mem. at 103).

These attempts to come within the forced seller exception may appear on initial examination as highly creative, with little foundation. However the Court believes that here again there is a complex mixed question of fact and law presented upon which reasonable persons could differ, and which is not amenable to disposition by summary judgement.

■ In any event, the plaintiff Rights holders who purchased the Rights on the open market satisfy the above "purchaser" requirement and accordingly can maintain their claims under the 1934 Act.

■ Keeping in mind that Section 10(b) does not provide relief for corporate mismanagement or breach of fiduciary duty, *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 479, 97 S.Ct. 1292, 1304, 51 L.Ed. 2d 480 (1977), a claim under this provision must allege material misstatements or omissions indicating an intent to deceive or defraud in connection with the purchase or sale of a security, *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed. 2d 668 (1976); *Luce v. Edelstein,* 802 F.2d 49, 55 (2d Cir.1986); as well as a causal relationship between the alleged violation and the resultant injury, *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 154, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972). Where the company has made unduly positive predictions in its reports to shareholders, and there are allegations of knowledge of the undisclosed negative factors, the complaint has been determined to state an adequate claim under § 10(b) and Rule 10b–5, because:

> "Liability may follow where management intentionally fosters a mistaken belief concerning a material fact, such as its evaluation of the company's progress and earnings prospects in the current year." *Goldman v. Belden,* 754 F.2d 1059, 1069 (2d Cir.1985), *citing Elkind v. Liggett & Myers, Inc.,* 635 F.2d 156, 164 (2d Cir.1980).

Such allegations have been made by these plaintiffs, and sufficient proof has been presented to raise a genuine issue of material fact with respect thereto.

While the failure to carry out a promise made as consideration for a sale of securities may be an element of a Section 10(b) claim, that failure does not constitute fraud if the promise was made with a good faith expectation that it would be carried out. *Luce v. Edelstein,* 802 F.2d at 56; *cf.*

**2.** As of October 14, 1986, when the latest distribution of sale proceeds was made, the distribution per Right was $33.22 (*see* Memorandum of Defendant Union Carbide at 7). At that time, the price of Union Carbide stock was $20.875 per share. Taking into account an intervening triple stock split, the value of the package was $62.625 plus $33.22, totalling $95.85 per share/Right. (This figure represented 30 percent more than the final GAF offer of $78 per share).

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). However, plausible allegations that defendants made specific promises as part of the consideration for the transfer of securities while secretly intending not to carry them out or knowing that they could not be carried out, and that eventually they were not carried out, are sufficient to state a claim for relief under Section 10(b). *Luce*, 802 F.2d at 56; *Pross v. Katz*, 784 F.2d 455, 457 (2d Cir.1986); *McGrath v. Zenith Radio Corp.*, 651 F.2d 458, 466 (7th Cir.), *cert. denied*, 454 U.S. 835, 102 S.Ct. 136, 70 L.Ed.2d 114 (1981). Such promises must, of course, encompass particular actions and be more than a generalized promise to act as a faithful fiduciary. *Pross*, 784 F.2d at 458.

In the instant case, plaintiffs allege, and offer evidence to show, that these promises were known by defendant Union Carbide (and Morgan Stanley) to be false when made. The voluminous evidence, primarily in the form of deposition testimony at this stage of the proceedings, submitted by both sides to this litigation, must be presented to the trial jury for resolution. Reasonable people could differ as to whether the statements at issue actually contained material misrepresentations or omissions, and whether such misrepresentations, if so found, were intentional or reckless at the time promulgated.

In this connection, this Court joins our Court of Appeals in emphasizing that: "[n]ot every 'risky' investment rises to the level of fraud because the risk is insufficiently disclosed." *Denny v. Barber*, 576 F.2d 465, 469 (2d Cir.1978). Nor are we inclined to impose liability on the basis of statements that clearly "bespeak caution." *Luce v. Edelstein*, 802 F.2d at 56, *citing Polin v. Conductron Corp.*, 552 F.2d 797, 806 n. 28 (8th Cir.), *cert. denied*, 434 U.S. 857, 98 S.Ct. 178, 54 L.Ed.2d 129 (1977).

In addition, we concur with the defendants in their argument that corporate management generally does not have a duty to disclose facts that are a matter of common knowledge, common sense, or pub-

lic record. *Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir.1978).

Fair ground for litigation is surely presented by plaintiffs' contention that Union Carbide made a material factual misrepresentation, and engendered a contractual obligation and assumed a fiduciary duty by virtue of its statement to its shareholders that the Consumer Products businesses would be sold by means of a process which would "achieve the objective of realizing maximum value for our shareholders *while acting in the best interests of employees, customers, and suppliers of these businesses and the communities where they operate*" (January 2nd Letter to Shareholders at 3; January 3rd Supplement at 3) (emphasis added). We would ourselves like to consider it unlikely that a reasonable investor would rely on such doublespeak and obvious equivocation more consistent with a political speech than informative prose. It could also be maintained that shareholders (and open market purchasers) were thereby given full disclosure; Union Carbide in effect had informed them in so many words that these potentially conflicting interests would be considered and served, contrary to the short term economic interests of the Rights holders. That Union Carbide management thereafter allegedly did in fact further those interests by preserving management positions, benefitting Carbide employees, and maintaining supply contracts for the long term benefit of Carbide shareholders, arguably at an inherent detriment to the Rights holder interest in maximum sale proceeds, should have come as no surprise, in light of the above quoted statement. *See Santa Fe Industries, Inc. v. Green*, 430 U.S. at 474–77, 97 S.Ct. at 1301–03. At the same time the sentence is mendacious on its face, and a trial juror could find that reading it as a whole, the reasonable investor (presumably the ribbon clerks, if any be left in the market) could have believed that Union Carbide would sell the businesses for their maximum economic value. If the sentence quoted is subject to such a reasonable interpretation, little difficulty will follow in finding scienter inherent in the use of these

words themselves by sophisticated lawyers and business people.

Defendants have presented strong evidence of the reasonableness of defendant's projections. The sale price eventually obtained for the Consumer Products businesses, $2.215 billion, landed well within the range of $2 to 2.5 billion represented by Carbide. Plaintiffs counter with a more conjectural theory, the strength of which the Court will not now assess, that Carbide never intended or expected to receive the upper end of the range, and that investors based their valuations on the entire scale and hence the market price of the Rights was artificially inflated (*see* discussion of defendant Morgan Stanley, *supra*).

However, we cannot as a matter of law declare that a reasonable juror could not find otherwise, and that a reasonable investor, perhaps not as skeptical as this Court in matters in which such high flying prose as that of the January 2 letter are employed, could be so misled. Likewise, it is for the jury to determine whether the omitted information was indeed public knowledge at that time, as defendants contend, and to evaluate the nature of the effects of various market factors.

■ A ruling as to the adequacy of the pleadings in this context would call for an evaluation of the materiality of the nondisclosures, which determination would be a mixed question of law and fact. *See, e.g., TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 450, 96 S.Ct. 2126, 2133, 48 L.Ed.2d 757 (1976). Accordingly, a complaint may not properly be dismissed, or summary judgment granted, on the ground that the alleged misstatements or omissions are not material, unless they are so "obviously unimportant" to a reasonable investor in making his or her investment decisions that reasonable minds could not differ on the question of their importance. *Goldman v. Belden,* 754 F.2d at 1067; *Schlick v. Penn–Dixie Cement Corp.,* 507 F.2d 374, 381 (2d Cir.1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975); *Reingold v. Deloitte Haskins & Sells,* 599 F.Supp. 1241, 1262 (S.D.N.Y. 1984). This Court concludes that the alleged misstatements and omissions do not meet the characterization of "obviously unimportant", and thus constitute determinations of materiality more properly left to the province of the trier of fact.

Likewise, any assessment by this Court as to the sufficiency of the disclosures or the misleading nature of the representations would necessitate improper factual determinations. In *Goldman v. Belden, supra,* where defendants allegedly made a series of positive predictions while knowing of certain infirmities and flaws which must have caused them to have some reservations about the certainty of these figures, the Court of Appeals held that:

> "[t]he [district] court's conclusion that such disclosures as were made were sufficient to dispel whatever aura of certainty might have been created by the representations actually made appears, once again, to be judgment as to the materiality of the alleged misrepresentations and nondisclosures. While it may be that a jury would agree with that conclusion, we think it an inappropriate judgment to make as a matter of law."
> 754 F.2d at 1068.

Although the documents contained somewhat qualifying language, the "mere mention of such figures and the Company's statements considered as a whole could have conveyed to a reasonable investor the picture of a quite rosy future for the Company." *Id.* at 1069.

This is not the type of situation amenable to summary judgment. Plaintiffs have in this regard sustained their burden of withstanding defendants' motion for summary judgment by raising genuine questions of material fact properly reserved for the jury.

*State Claims*

■ The state law claims framed in Counts Four through Seven as against Union Carbide, namely, breach of contract, breach of fiduciary duty, common law fraud and deceit, and negligent misrepresentation, by their very nature hinge upon factual determinations, several of which are noted above, appropriate solely for the reasonable juror. Inasmuch as these

claims present material issues of fact, defendants' motion for summary judgment must be denied as to these claims.

The Court notes that, in connection with Count Six, to the extent this claim for common law fraud and deceit is founded upon alleged omissions of the defendants, plaintiffs must ultimately convince a jury that there was a fiduciary relationship between the parties, *see Wood v. Amory*, 105 N.Y. 278, 281–82, 11 N.E. 636 (1887), or at least that the defendant knew that the plaintiffs were acting under a mistaken belief with respect to a material fact, *see Donovan v. Aeolian Co.*, 270 N.Y. 267, 271, 200 N.E. 815 (1936). *See also Frigitemp Corp. v. Financial Dynamics Fund, Inc.*, 524 F.2d 275, 283 (2d Cir.1975).

In addition, insofar as plaintiff Rights holders seek to assert a fiduciary duty which is derivative in nature, the Court refers the reader to the discussion thereof in its Memorandum and Order dated July 31, 1987 at 566–67.

*Further Proceedings*

While this Court has generally regarded the preparation and entry of a pre-trial order as a waste of time and effort, it does seem that in the unusual circumstances of this case, trial would be expedited by such an order which would at least set forth the factual issues to be tried. Subject to further revision at the instance of counsel for the parties, and intending neither finality nor exclusivity at this time, the following issues of material fact, in addition to those noted heretofore in this decision are believed to require a trial:

1. Whether the supply contracts required by Union Carbide materially affected the potential market value of the Consumer Product businesses, or discouraged potential bidders, and whether the fact that these contracts and other restrictions were to be imposed on the future management of prospective purchasers would be considered significant by a reasonable investor (*see, e.g.,* Tr. of April 28, 1987 Hearing at 79, 82);

2. Whether the use of qualifying language such as, "[a]ctual pre-tax sale proceeds may vary from these estimates based upon the final terms of sale. There can be no assurance that pre-tax sale proceeds will be in the range of $2.0 to $2.5 billion or that the net book value of the businesses to be sold will equal $1.1 billion", contained in the January 23, 1986 Union Carbide Form 8K, and the January 3, 1986 Supplement to Offer to Purchase, would be sufficient to "bespeak caution" to the reasonable investor;

3. The extent to which the existence and number of outstanding Union Carbide stock options and convertible debentures as of December 1985, and the potential for dilution created thereby, were disclosed to or known by the market on January 3, 1986;

4. Whether Union Carbide sold the Consumer Products businesses by a competitive bidding process, including whether the process was designed to and did provide all prospective bidders with fair access to any and all information necessary to prepare their bids, and whether the meetings and telephone conversations between H & A management and First Boston representatives had an adverse impact on the bidding process or the price received for the H & A business;

5. Whether Carbide in fact represented that it would conduct such a competitive bidding process, taking into consideration its accompanying doublespeak statement that its objective in selling the Consumer Products businesses was to obtain "maximum value for our shareholders while acting in the best interests of employees, customers, and suppliers of these businesses and the communities where they operate" (January 2nd Letter to Shareholders at 3; January 3rd Supplement at 3).

6. Whether Union Carbide and its directors relied in good faith on the advice of Morgan Stanley in estimating that the net pretax sale proceeds from the sale of the Consumer Products businesses would likely range from $2.0 billion to $2.5 billion, and whether this estimate had a good faith, nonreckless basis;

7. Whether any bidder offered a higher price for the H & A business than did First

Boston; prospective purchasers were discouraged from bidding by the announced range of possible proceeds; or any bidder or other person would have paid more for the Consumer Products businesses than Union Carbide in fact received upon possession of information made available to First Boston;

8. Whether arrangements for supply contracts with the purchaser of the H & A business were more valuable to Union Carbide's shareholders than a maximum payment on the Rights would have been;

9. Whether Union Carbide accurately disclosed that any "expenses, debts, liabilities and obligations of, and claims against, the Company in connection with" the sale of the Consumer Products businesses would be deducted from the amount that holders of the Rights would receive;

10. Whether the expenses, retained liabilities and book value that Union Carbide deducted from the gross sale proceeds in determining the amount to be distributed to Rights holders were all within the contemplation of the Rights Agreement or other contractual agreements benefiting the alleged class, and whether any of these deductions were calculated or determined improperly, or with the intention to defraud;

11. Whether there existed a preconceived fraudulent plan on the part of Union Carbide or its directors to "corrupt" the bidding process, to make material misrepresentations or omissions, or to commit any of the other acts of which plaintiffs complain;

12. Whether any act or conduct of Union Carbide or its directors injured any of the plaintiffs in any quantifiable amount.

The Court reserves at this time for further consideration whether the finding contemplated by Rule 54(b), F.R.Civ.P., would be appropriate at this time insofar as concerns the First Boston defendants.

So Ordered.